**Robert LEDERMAN, Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

**No. CIV. A. 99–3359 (RWR).**

United States District Court, District of Columbia.

March 14, 2000.

Neal Goldfarb, Oblon, Spivak, McClelland, Maier & Neustadt, Arlington, VA, for Plaintiff.

Marina Utgoff Braswell, United States Attorney's Office, Eugene A. Adams, III, Kimberly C. Matthews, Thomas L. Koger, Allison Alvarado, Office of Corporation Counsel, D.C., Washington, D.C., for Defendants.

### *MEMORANDUM OPINION*

ROBERTS, District Judge.

This suit involves a statutory and constitutional challenge to the creation and enforcement of a regulation governing expressive activity in the area immediately around the United States Capitol. The parties have cross-moved for summary judgment with respect to the validity of the regulation. Because I find that the regulation is reasonably related to the purpose of the enabling statute, but is not narrowly tailored to further a significant governmental interest, the parties' cross-motions for summary judgment will be granted in part and denied in part. I also will issue a declaratory judgment invalidating the offending regulatory language on its face as contrary to the First Amendment and permanently enjoin its enforcement.

## I.  BACKGROUND

### A.  *Factual Background*

The events giving rise to this action are undisputed. They occurred approximately three years ago when plaintiff, an artist and president of an organization called Artists' Response to Illegal State Tactics

("A.R.T.I.S.T."), was arrested in front of the Capitol while leafleting. (Decl. of Robert Lederman, Attach. Pl.'s Mem. Supp. Prelim. Inj., ("Lederman Decl.") at ¶ 2.) On March 11, 1997, plaintiff took part in Arts Advocacy Day, an annual event here in Washington attended by museum directors, curators, and others who seek to discuss and promote policies supporting the arts. (*Id.* at ¶ 3.) Plaintiff went to the Capitol to hand out leaflets concerning a successful lawsuit he and other arts advocates had brought to secure artists' constitutional right to sell their work on New York City's sidewalks. (*Id.* at ¶ 4.) [1]

Plaintiff began his leafleting activity on Arts Advocacy Day at the foot of the Senate steps on the East Front of the Capitol. (*Id.* at ¶ 5.) He also held a placard which read "Stop Arresting Artists." (Defs.' Stmnt. of Material Facts as to Which There is No Genuine Issue ("Defs.' Stmnt.") at ¶ 6.) While leafleting, plaintiff was approached by Capitol Police officers who indicated that leafleting was not permitted where the plaintiff was located and that he should move to the grassy area across the East Front Plaza where leafleting was permitted. (Lederman Decl. at ¶ 6.) East Front Plaza is a large paved area immediately beyond the base of the House, Senate, and Center steps on the east side of the Capitol. Plaintiff, however, did not move to the grassy area on the other side of East Front Plaza because he believed that he could not reach his intended audience from there given the light pedestrian traffic on the lawn. (*Id.* at ¶ 6.) The officer then directed plaintiff to the base of the House steps on the East Front. (*Id.* at ¶ 7; Defs.' Stmnt. at ¶ 6.) Plaintiff waited there and after a few minutes began to pass out leaflets. (Defs.' Stmnt. at ¶ 6.)

As the plaintiff continued to leaflet in front of the House steps, he was ap-proached by Lieutenant Lawrence Louthery and Officer Charles McQuay of the Capitol Police, both of whom are defendants in this action. (*Id.* at ¶ 7; Lederman Decl. at ¶ 8.) Lieutenant Louthery told the plaintiff that he had to move to one of the designated areas on the Capitol grounds where leafleting was permitted, the closest of which was on the lawn approximately thirty yards away. (Lederman Decl. at ¶ 8.) Plaintiff refused to move, citing his constitutional right to leaflet where he was. (*Id.*)

Lieutenant Louthery explained to the plaintiff that he was violating the law and would be arrested if he continued to pass out leaflets at that location. (*Id.* at ¶ 9.) Plaintiff again refused to move and continued leafleting. (*Id.*) Approximately fifteen minutes later, Officer McQuay gave the plaintiff a citation for demonstrating without a permit. (Defs.' Stmnt. at ¶ 10.) Lieutenant Louthery reiterated to the plaintiff that he would be arrested if he continued to leaflet without moving to one of the designated areas. (*Id.*)

A moment later, a man wearing an "Arts Advocate" button walked by the plaintiff and asked him what he was handing out. (Lederman Decl. at ¶ 10.) Plaintiff told the man that the police would arrest him if he handed out any more leaflets, but that the man could take a leaflet from the stack in plaintiff's hand. (*Id.*) The man did so, at which point plaintiff was placed under arrest by Officer McQuay at Lieutenant Louthery's direction. (*Id.*)

Plaintiff was charged in D.C. Superior Court with "demonstrating without a permit on the Capitol grounds," in violation of Article XIX, section 158 of the Capitol Police Board Traffic and Motor Vehicle Regulations for the United States Capitol Grounds ("Capitol Grounds Regulations"). (*Id.* at ¶ 13.) In an unpublished opinion, Hearing Commissioner Byrd entered a

---

1. *See Bery v. City of New York*, 97 F.3d 689 (2d Cir.1996) (reversing district court's denial of plaintiffs' motion to enjoin enforcement of a city regulation requiring visual artists to obtain a general vendor's license in order to offer their works for sale in public places), *cert. denied*, 520 U.S. 1251, 117 S.Ct. 2408, 138 L.Ed.2d 174 (1997).

judgment of acquittal after finding that the regulation at issue was unconstitutional on its face and as applied to the plaintiff's conduct. *See District of Columbia v. Lederman,* No. D–967–97 (D.C.Super.Ct. Nov. 30, 1998). Plaintiff, who intends to leaflet again on the Capitol Grounds during this year's Arts Advocacy Day, has now brought this action. He seeks to preliminarily and permanently enjoin enforcement of the Capitol Grounds regulation he was charged under in 1997. He also seeks compensatory damages for his arrest. Plaintiff has named as defendants the United States, the United States Capitol Police, the Chief of the Capitol Police, Lieutenant Louthery, and Officer McQuay (collectively the "federal defendants") as well as the District of Columbia and the Corporation Counsel for the District (collectively the "D.C. defendants").

### B. *The Capitol Grounds Regulations*

The Capitol Police Board (the "Police Board") has authority over "the regulation and movement of all vehicular and other traffic . . . within the United States Capitol Grounds; and said Board is authorized and empowered to make and enforce all necessary regulations therefor. . . ." 40 U.S.C. § 212b(a) (1994). Pursuant to this authority, the Police Board promulgated the Capitol Grounds Regulations which, among other things, regulate "demonstration activity" on the Capitol Grounds. The Capitol Grounds Regulations define "demonstration activity" as:

[P]arading, picketing, speechmaking, holding vigils, sit-ins, or other expressive conduct that conveys a message

supporting or opposing a point of view or has the intent, effect, or propensity to attract a crowd or onlookers, but does not include merely wearing Tee shirts, buttons, or other similar articles of apparel that convey a message.

XIX Capitol Grounds Regulations § 158(a).

While the Capitol Grounds Regulations purport to permit groups of under 20 individuals to engage in demonstration activity on the Capitol Grounds without a permit, *see id.* at § 158(b)(3), a 1995 amendment makes the area immediately around the Capitol virtually off-limits to all demonstration activity. Amendment II, as it is known, provides in relevant part:

Demonstration activity is permitted on Capitol Grounds, subject to this provision and applicable law, as indicated on the map entitled "United States Capitol Grounds Demonstration Areas Map," dated September 15, 1995, and approved by the Capitol Police Board. The map identifies those areas of Capitol Grounds wherein demonstration activities are permitted and those wherein demonstration activities are prohibited.

The map referenced in Amendment II, and attached to this Opinion as an appendix, indicates that the no-demonstration zone extends completely around the Capitol and encompasses all of the sidewalks immediately adjacent to it.[2] Plaintiff has taken measurements, which are undisputed for the purpose of the pending motions, estimating that the no-demonstration zone extends approximately 250 feet from the foot of the House and Senate steps. (Decl. of

---

2. As Hearing Commissioner Byrd described it:

On the East Front the no-demonstration zone extends across the plaza, past the small retaining wall, to the grassy area. On the north side of the Capitol Building the no demonstration zone extends to Constitution Avenue; on the south side to Independence Avenue; and on the west side to the lower terrace level. Within the no-demonstration zone there are several "Free Credentialed Press Area[s]." The areas are

very near the outer boundaries of the no-demonstration zones and are located in the following approximate positions: Two are on the southwest corner of the House Building; one is in the southeast corner of the House Building, two are in the northwest corner of the Senate Building; and two are in the northeast corner of the Senate Building.

*District of Columbia v. Lederman,* slip. op. at 8 n. 11.

Fritz Mulhauser, Attach. to Pl's Reply Supp. Prelim Inj., at ¶ 4.) Demonstration activity is, however, allowed on the East Front Center steps so long as the demonstrator has first obtained a permit. *See* XIX Capitol Grounds Regulations § 158(b)(1). Thus, section 158 as amended imposes a total ban on demonstration activity within the 250 foot perimeter of the Capitol Building, except for such activity on the East Front Center steps where a permit is required. There is no dispute that plaintiff was arrested within the no-demonstration zone.

### C. *Procedural History*

Plaintiff has filed this action seeking injunctive and declaratory relief that would enable him to leaflet and engage in other demonstration activity within the no-demonstration zone at this year's Arts Advocacy Day without fear of arrest. In Count I of his complaint, plaintiff contends that section 158 as amended is unconstitutional under the First Amendment both on its face and as applied. In Count II, plaintiff alleges that the amended regulation is not a valid exercise of the Capitol Police Board's rulemaking authority. The remainder of plaintiff's complaint charges that his 1997 arrest and imprisonment as a result of his demonstration activity was a violation of his constitutional rights for which he is entitled to compensatory damages, plus costs and reasonable attorney's fees.

Plaintiff originally moved for a preliminary injunction, but has since stipulated that his motion should be treated as one for summary judgment with respect to Counts I and II. The federal defendants have in turn moved to dismiss, or in the alternative, for summary judgment on Counts I and II. The D.C. defendants have moved to dismiss, or in the alternative, for summary judgment with respect to the entire complaint. This Opinion will address the merits of the parties' arguments with respect to Counts I and II.

## II. *DISCUSSION*

### A. *Procedural Standard of Review*

In light of the plaintiff's stipulation and the matters outside of the pleadings presented by the defendants, the pending cross-motions will be treated as ones for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 12(b). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The issue, therefore, is "whether the evidence presents a sufficient disagreement to require submission to a [fact-finder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The parties agree that summary judgment is appropriate here because the amended regulation's validity is a question of law.

### B. *Statutory Authority*

■ Though the parties exert most of their energy analyzing the constitutionality of section 158 as amended, a court should "decid[e] statutory claims first to avoid unnecessary constitutional adjudications." *Douglas v. Seacoast Products, Inc.,* 431 U.S. 265, 272, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977). Plaintiff's contention that the creation of a no-demonstration zone around the Capitol exceeds the Police Board's congressionally-delegated rulemaking authority therefore will be addressed at the outset.

■ It is well-settled that a regulation need only be "reasonably related to the purposes of the enabling legislation." *Mourning v. Family Publications Serv., Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973) (internal quotations and citation omitted). While this is "a stricter test than minimum rationality re-

quired of congressional statutes[,]" *Community for Creative Non–Violence ("CCNV") v. Kerrigan*, 865 F.2d 382, 387 (D.C.Cir.1989) (citations omitted), the standard remains deferential. *See Mourning*, 411 U.S. at 371–72, 93 S.Ct. 1652 ("We have consistently held that where reasonable minds may differ as to which of several remedial measures should be chosen, courts should defer to the informed experience and judgment of the agency to [which] Congress delegated appropriate authority."). Plaintiff therefore "shoulder[s] a difficult burden to prove that the regulation is inconsistent with the purpose of the enabling legislation." *Florida v. Mathews*, 526 F.2d 319, 323 (5th Cir.1976).

■ The Police Board promulgated the amended regulation pursuant to 40 U.S.C. § 212b, which provides:

> The Capitol Police Board ... shall have exclusive charge and control of the regulation and movement of all vehicular and other traffic ... within the United States Capitol Grounds; and said Board is authorized and empowered to make and enforce all necessary regulations therefor....

*Id.* The stated purpose of 40 U.S.C. § 212b "is to provide for the promulgation of traffic regulations pertaining to the Capitol Grounds." S.Rep. No. 144, at 1 (1947), *reprinted in* 1947 U.S.S.C.A.N. 1280. The D.C. Circuit therefore has held that regulations promulgated pursuant to 40 U.S.C. § 212b must be "reasonably related to traffic-related interests." *Kerrigan*, 865 F.2d at 385. Plaintiff argues that section 158 as amended fails this test because it bans activities around the Capitol that "pos[e] no threat to the free movement of traffic," and also irrationally prohibits certain activities (such as individual leafleting) which do not generally obstruct traffic, while permitting other activities (such as large tour groups) which pose a more distinct threat to blocking traffic. (Pl.'s Mem. Supp. Prelim. Inj. at 19.)

In response, the federal defendants submitted the Declaration of Chief Gary L. Abrecht, Chief of the Capitol Police, to shed light on Amendment II's relationship to traffic control.[3] Chief Abrecht points out that the House and Senate steps provide access to the Capitol Building for Members of Congress and Senators. (Abrecht Decl. at ¶ 2.) In addition, East Front Plaza is used for parking by authorized officials and "is also the main vehicular thoroughfare used by security motorcades for national and foreign dignitary access to the Capitol." (*Id.*) According to Chief Abrecht, "there is an obvious and serious safety concern relative to allowing an individual to demonstrate since the distraction of focusing on a demonstration creates an inherent danger involving vehicular traffic." (*Id.*)

Based on the congressional intent manifested in the enabling statute's text, I cannot conclude that the Police Board lacks the statutory authority to create a no-demonstration zone in a heavily trafficked area of the Capitol Grounds. Congress not only gave the Police Board "exclusive charge and control of the regulation and movement of all vehicular and other traffic ... within the United States Capitol Grounds," it also gave the Board the authority "to make and enforce all necessary regulations therefor...." 40 U.S.C. § 212b. The statute's plain language therefore indicates that Congress intended to give the Police Board wide discretion in controlling pedestrian and vehicular traffic at the Capitol. Plaintiff cites no legislative history to the contrary. Whether the Police Board exercised this discretion in a manner that is consistent with the Constitution is, of course, a separate matter. *See infra* Part II.C. As a question of statutory interpretation, however, I cannot conclude that section 158 as amended "bear[s] no

---

**3.** The D.C. Circuit has explicitly endorsed the use of such declarations in discerning the purposes of the Capitol Grounds Regulations. *See Kerrigan*, 865 F.2d at 385 & n. 5 (relying on Architect of the Capitol's affidavit).

reasonable relationship to the purposes for which [the Police Board's] rule-making power was authorized." *Thorpe v. Housing Auth. of the City of Durham*, 393 U.S. 268, 281, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969).

Creating a buffer zone between the Capitol and demonstrators unquestionably diminishes vehicular and pedestrian traffic congestion in the Capitol's immediate vicinity by pushing demonstrators back 250 feet from the Capitol. While plaintiff is certainly correct that large tourist groups may also cause congestion, that congestion would likely be compounded by the presence of demonstrators at or near the same location. It also is not unrealistic to imagine that there is at least some potential that clusters of individual demonstrators could, to varying degrees, impede access to the Capitol or disrupt traffic around the building. Plaintiff has thus failed to carry his burden of demonstrating that the amended regulation bears no reasonable relationship to legitimate traffic-control concerns. Accordingly, plaintiff's motion for summary judgment with respect to Count II will be denied and defendants' cross-motions on that count will be granted.

## C. *Constitutional Analysis*

█ Although section 158 as amended was within the Police Board's authority to enact, it must also pass muster under the far more exacting standards of the First Amendment. The degree of First Amendment scrutiny accorded to governmental decisions limiting speech on public property depends on whether the property in question is a traditional public forum, a government-designated public forum, or a non-public forum. *See Perry Education Ass'n. v. Perry Local Educators' Ass'n.,*

460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Restrictions on speech in either category of public forum must be "reasonable time, place, and manner regulations" that are "content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels for communication." *Id.*[4] Speech restrictions in non-public forums, on the other hand, are permissible "so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).

### 1. *Type of Forum*

█ Whether a particular piece of property is a traditional public forum depends for the most part on whether it is a place that has "historically been associated with the free exercise of expressive activities...." *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (holding that the sidewalks surrounding the Supreme Court are a traditional public forum). Such places typically include "streets and parks which 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Perry,* 460 U.S. at 45, 103 S.Ct. 948 (quoting *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)). By contrast, places that are inconsistent with public debate and assembly are not public fora. *See United States v. Kokinda,* 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (plurality opinion) (holding that walkway from post office to adjoining parking lot was not a public forum); *Greer v. Spock,*

---

**4.** This level of scrutiny is significantly higher than the deferential "reasonable relationship" test applied to plaintiff's ultra vires claim discussed above in Part II.A. As the D.C. Circuit has emphasized in scrutinizing speech restrictions on the Capitol Grounds under the First Amendment, "[i]t is not enough that a regulation is facially reasonable, or that a governmental interest is significant; rather, it must be shown that a reasonable regulation is narrowly tailored to substantially serve a significant governmental interest." *Kerrigan,* 865 F.2d at 388.

424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (holding that military base was not a public forum).

■ The notion espoused by the defendants that the area in the shadow of the Capitol Dome is something other than a traditional public forum is contrary to the weight of legal authority.[5] The Supreme Court has recognized that in assessing the reasonableness of a time, place, or manner regulation, "[t]he crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Grayned v. City of Rockford,* 408 U.S. 104, 116, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Courts must therefore "consider[ ] the nature of the forum the speaker seeks to employ." *Frisby v. Schultz,* 487 U.S. 474, 479, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). Because "the fundamental function of a legislature in a democratic society assumes accessibility to [popular] opinion" it is virtually self-evident that "demonstrations on or near legislative grounds fall within the protections of the First Amendment." *Jeannette Rankin Brigade v. Chief of Capitol Police,* 342 F.Supp. 575, 584 (D.D.C.) (three-judge panel) (striking down 40 U.S.C. § 193g which banned certain forms of demonstration activity on the Capitol Grounds), *aff'd,* 409 U.S. 972, 93 S.Ct. 311, 34 L.Ed.2d 236 (1972). In short, there is perhaps no more important a place than the Capitol, the epicenter of our nation's democracy, where "debate on public issues should be uninhibited, robust, and wide-open. . . ." *New York Times Co.*

*v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

Although the case law draws no such distinction, defendants argue that only certain areas of the Capitol Grounds are traditional public fora and that the area immediately around the Capitol is not now and has never been such a place. (Abrecht Decl. at ¶ 2.) In support of this proposition, defendants cite 40 U.S.C. § 193g, which imposed a ban on demonstration activity at the Capitol Grounds between 1882 and 1972 when it was finally struck down in *Jeannette Rankin Brigade.* They also aver that, prior to Amendment II's enactment in 1995, it was the Capitol Police's standard practice to forbid demonstration activity in the area immediately around the Capitol.

Neither argument carries much weight. With respect to the former contention, it is settled that time, place, and manner restrictions cannot "bootstrap themselves into validity by their mere existence, even if prolonged." *Henderson v. Lujan,* 964 F.2d 1179, 1183 (D.C.Cir.1992) (holding that a sidewalk near the Vietnam Veterans Memorial is a public forum despite longstanding prohibition on leafleting there); *see also Grace,* 461 U.S. at 180, 103 S.Ct. 1702 ("Nor may the government transform the character of the property by the expedient of including it within the statutory definition of what might be considered a non-public forum parcel of property"); *United States Postal Serv. v. Greenburgh Civic Ass'ns,* 453 U.S. 114, 133, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981) (commenting

---

5. *See, e.g., Kerrigan,* 865 F.2d at 387 ("There is no doubt that the Capitol Grounds are a public forum"); *Jeannette Rankin Brigade v. Chief of Capitol Police,* 342 F.Supp. 575, 584 (D.D.C.) (three-judge panel) ("The Capitol Grounds (excluding such places as the Senate and House floors, committee rooms, etc.) have traditionally been open to the public; indeed, thousands of people visit them each year"), *aff'd,* 409 U.S. 972, 93 S.Ct. 311, 34 L.Ed.2d 236 (1972); *Kroll v. United States Capitol Police,* 590 F.Supp. 1282, 1289 (D.D.C.1983) ("The United States Capitol is a unique situs for demonstration activity"),

*rev'd on other grounds,* 847 F.2d 899 (D.C.Cir. 1988); *Farina v. United States,* 622 A.2d 50, 55 (D.C.1993) (Rogers, J.) (describing the Capitol Grounds as "a quintessential public forum."). *Cf. Edwards v. South Carolina,* 372 U.S. 229, 235, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963) (characterizing demonstrations on the grounds of a state legislature to be "an exercise of these basic constitutional rights in their most pristine and classic form"); *Adderley v. Florida,* 385 U.S. 39, 41, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) ("Traditionally, state capitol grounds are open to the public.").

that government "may not by its own *ipse dixit* destroy the 'public forum' status of streets and parks which have historically been public forums...."). Although the ban on demonstration activity contained in 40 U.S.C. § 193g was long-standing, it was nevertheless struck down as an unconstitutional restriction on speech in *Jeannette Rankin Brigade.* To find that an unconstitutional law provides the basis for classifying the Capitol as a nonpublic forum would be classic bootstrapping.

Defendants' resort to standard Capitol Police practice is also unavailing. Defendants cite no specific statutory or regulatory provision in place between 1972 and 1995 that imposed an outright ban on all demonstration activity in the current no-demonstration zone. If such a ban did exist, one would wonder why Amendment II was necessary. In fact, prior to Amendment II's enactment in 1995, section 158(b)(3) actually allowed groups of under 20 to engage in demonstration activity without a permit, making no reference to any particular area in which such activity was forbidden.[6] Defendants thus present no compelling reason to depart from the well-founded presumption that the Capitol Grounds as a whole, which necessarily include the area immediately around the Capitol itself, constitute a traditional public forum.

### 2. *Application of Scrutiny*

Because the area within the current no-demonstration zone is just as much a traditional public forum as the rest of the Capitol Grounds, "it follows that 'the government's ability to permissibly restrict expressive conduct [on the Grounds] is very limited....'" *Kerrigan,* 865 F.2d at 387 (quoting *Grace,* 461 U.S. at 177, 103 S.Ct. 1702); *see also Perry,* 460 U.S. at 45, 103 S.Ct. 948 ("In places which by long tradition or government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed."). Regulations restricting speech on the Capitol Grounds are permissible "so long as the restrictions 'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" *Grace,* 461 U.S. at 177, 103 S.Ct. 1702 (quoting *Perry,* 460 U.S. at 45, 103 S.Ct. 948). This three-step inquiry necessarily entails "weighing the particular First Amendment rights asserted against countervailing state interests." *Jeannette Rankin Brigade,* 342 F.Supp. at 584. However, the regulation need not be "the least intrusive means" of advancing those interests. *See Ward v. Rock Against Racism,* 491 U.S. 781, 797–98, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *Regan v. Time, Inc.,* 468 U.S. 641, 657, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984) (plurality opinion); *Clark v. CCNV,* 468 U.S. 288, 299, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984); *Kerrigan,* 865 F.2d at 391 n. 9.

In *Kerrigan,* the D.C. Circuit upheld a Capitol Grounds regulation that prohibited all props and equipment from remaining on the Capitol Grounds for more than 24 consecutive hours. In so doing, the panel enunciated the following guiding principles it had gleaned from prior Supreme Court and D.C. Circuit opinions regarding the "narrowly tailored" test: (1) simply because a regulation limits expression does not make it unlawful; (2) the First Amendment is not satisfied by mere assertions that the regulation serves a significant government interest, or by regulations that contribute only marginally to that interest; (3) government agencies with authority to regulate the area in question deserve "a reasonable measure of discretion in determining how best to promote significant governmental interests"; and (4) if the regulation at issue withstands the close scrutiny required by the First

---

6. Until 1983, the Capitol Grounds Regulations required all demonstrators to obtain a permit. *See Kroll,* 590 F.Supp. at 1291 (narrowly construing permit requirement imposed by XIX Capitol Grounds Regulations § 153 as not reaching peaceful and unobstructive sign-holding).

Amendment, it must be upheld and courts "will not tinker with the regulation to make it less burdensome on particular parties." *Kerrigan,* 865 F.2d at 390.

Application of the foregoing principles requires the invalidation of that portion of the amended regulation that was applied to the plaintiff's conduct at issue in his complaint. There is no dispute that the amended regulation is content-neutral (*i.e.* that it applies to all demonstrators irrespective of their message) and that the governmental interests it purports to advance (which include not only traffic flow, but also safety and security) are significant. There is also no question that plaintiff's leafleting falls within the prohibition on demonstration activity established by section 158 as amended. The parties' dispute instead centers on whether the amended regulation leaves open adequate alternative channels of communication and whether it is narrowly drawn. I will address each issue in turn.

a) *Alternative Channels of Expression*

■ Plaintiff argues that the amended regulation does not leave open adequate alternative channels of communication because he cannot reach his chosen audience by leafleting on the grassy areas outside of the no-demonstration zone. However, the Supreme Court has held that "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) (upholding state fair rule requiring distribution of written material to be done from a fixed location within the fairgrounds). As the D.C. Circuit has summarized, "In considering whether a regulation leaves open ample alternative channels of communication, the [Supreme] Court has generally upheld regulations which merely limit expressive activity to a specific part of the regulated area or to a limited time." *CCNV v. Turner,* 893 F.2d 1387, 1393

(D.C.Cir.1990) (invalidating permit requirement that otherwise completely banned free speech activity on all property owned by the Washington Metropolitan Area Transit Authority ("WMATA")).

In contrast to the regulation at issue in *Turner,* section 158 as amended leaves large portions of the Capitol Grounds completely open to demonstration activity by groups of under twenty. As Lieutenant Louthery and Officer McQuay indicated when they first approached the plaintiff, he could have demonstrated without a permit on one of the grassy areas outside of the no-demonstration zone. (Abrecht Decl. at ¶ 3.) If that was too far away from the Capitol for plaintiff's liking, he could have obtained a permit to leaflet right on the Capitol's East Front Center steps. (*Id.*) Finally, he could have leafleted on the sidewalks adjacent to the House and Senate Office Buildings as well. (*Id.*)

In this respect, section 158 as amended is analogous to the National Park Service regulation upheld by the D.C. Circuit in *White House Vigil for the ERA Comm. v. Clark,* 746 F.2d 1518, 1528 (D.C.Cir.1984), which prohibited "stationary protest" within the "center zone" of the sidewalk in front of the White House. *Id.* The court found that this restriction left open ample alternative channels for communication because the rest of the sidewalk was still available as was Lafayette Park across the street. *See id.* The court also rejected a contention similar to the one advanced by the plaintiff here that a demonstrator cannot be denied a "particularly evocative site for symbolic protest...." *Id.* at 1537. Although the area at the foot of the Capitol steps, like the center of the sidewalk outside of the White House, might be the preferred place for the plaintiff to disseminate his message, the amended regulation does not prevent him from leafleting in other well-traveled and symbolic locations on the Capitol Grounds. By limiting the no-demonstration zone to the area immediately around the Capitol and by permitting demonstrators to demonstrate on the Cen-

ter steps so long as they have obtained a permit, section 158 as amended leaves open ample alternative places on the Capitol Grounds for the free exercise of First Amendment rights.

### b) *Narrow Tailoring*

■ Although section 158 as amended passes the alternative channels inquiry, the narrow tailoring requirement presents a far more formidable obstacle. A regulation is narrowly drawn if it does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward,* 491 U.S. at 799, 109 S.Ct. 2746; *see also Frisby,* 487 U.S. at 485, 108 S.Ct. 2495 ("A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy.").

■ Section 158 as amended bars three general categories of activity within 250 feet of the Capitol: (1) "parading, picketing, speechmaking, holding vigils, sit-ins"; (2) "other expressive conduct that conveys a message supporting or opposing a point of view"; and (3) other expressive conduct that "has the intent, effect, or propensity to attract a crowd or onlookers. . . ." Plaintiff Lederman's conduct at issue in this case fell within the second category. Commissioner Byrd, who presided over the plaintiff's criminal trial, found that plaintiff's leafleting was expressive conduct conveying to others his position on the First Amendment rights of visual artists; it was not "parading, picketing, speechmaking, holding a vigil [or sitting-in]." *District of Columbia v. Lederman,* slip. op. at 19.[7] Thus, my review focuses upon the second category of expressive activity proscribed by the amended regulation.

The parties agree that section 158 as amended imposes a total ban on demonstration activity within the 250 foot perimeter of the Capitol other than on the East Front Center steps where a permit is required. While relatively limited restrictions on speech within traditional public fora have been upheld in the past,[8] blanket prohibitions have consistently been struck down as burdening substantially more speech than necessary to achieve their ends.

For instance, in *Jeannette Rankin Brigade,* 342 F.Supp. at 586–88, a three-judge panel of this Court struck down a 90 year-old ban on certain forms of demonstration activity on the Capitol Grounds. The case arose when an organized group of women opposed to the war in Vietnam sought to march from Union Station to the East

---

7. The Commissioner compressed the second and third categories of activity into one and found that plaintiff's conduct fell within the combined category. *See District of Columbia v. Lederman,* slip. op. at 18.

8. *See, e.g., Clark v. CCNV,* 468 U.S. at 296–98, 104 S.Ct. 3065 (upholding Park Service regulation which prohibited camping in certain Washington, D.C. parks as narrowly tailored to "maintaining the parks in the heart of our Capital in an attractive and intact condition"); *Kerrigan,* 865 F.2d at 391 (upholding regulation prohibiting props and equipment from remaining on the Capitol Grounds for more than 24 consecutive hours as furthering Capitol Police's legitimate interest in maintaining "day-to-day control over use of the Capitol Grounds"); *Juluke v. Hodel,* 811 F.2d 1553, 1559–61 (D.C.Cir.1987) (upholding regulation prohibiting placement of parcels on the sidewalk in front of the White House as narrowly tailored to serve significant governmental interest in safety, traffic flow, and aesthetics); *White House Vigil,* 746 F.2d at 1532–41 (finding overwhelming interest in presidential security, among other things, justified parcels regulation, regulation limiting types of signs used on White House sidewalk, and regulation restricting (but not prohibiting) demonstrations in the center of the sidewalk).

It should be noted, however, that a major security concern cited in *White House Vigil* does not apply with equal force to the Capitol. The Capitol, unlike the White House, is not the "nerve center for America's national security network. . . ." *White House Vigil,* 746 F.2d at 1533. The Capitol's primary role is legislative. There is thus somewhat less of a security justification for restricting demonstration activity around the Capitol as opposed to the White House.

Front Plaza of the Capitol (which abuts the area where plaintiff was arrested in 1997) and peacefully present petitions to congressional leaders there. *See id.* at 578. When they were denied permission to do so, they brought suit challenging a statute which provided in relevant part:

> It is forbidden to parade, stand, or move in processions or assemblages in said United States Capitol Grounds, or to display therein any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement. . . .

*Id.* at 577 (quoting 40 U.S.C. § 193g). After ruling that the Capitol Grounds were a traditional public forum, the panel had little trouble finding that section 193g was not narrowly tailored to meet the same significant government interests which purportedly motivated the enactment of Amendment II. *See id.* at 585 (acknowledging that "[m]any substantial governmental interests may be jeopardized by mass demonstrations on the Capitol Grounds, including damage to buildings and grounds, obstruction of passageways, and even dangers to legislators and staff."). The statute nevertheless fell because "the terms of § 193g flatly prohibit all assemblages, whether or not they threaten those interests." *Id.*[9] The Supreme Court summarily affirmed. *See Chief of Capitol Police v. Jeannette Rankin Brigade,* 409 U.S. 972, 93 S.Ct. 311, 34 L.Ed.2d 236 (1972).

Eleven years later, in *Grace,* the Supreme Court addressed the constitutionality of an identically-worded statute, 40 U.S.C. § 13k, as it applied to the Supreme Court grounds. The case was brought by a leafletter and a picketer who held a sign bearing the text of the First Amendment. *Grace,* 461 U.S. at 173–74, 103 S.Ct. 1702. The Supreme Court struck down that portion of the statute which reached the con-

duct in which the plaintiffs had engaged. The Court invalidated a ban on the "display [of] any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement" as it applied to the sidewalks adjacent to the Court grounds. *Id.* at 181–84, 103 S.Ct. 1702. It reasoned that a provision "which totally bans the specified communicative activity on the public sidewalks around the Court grounds, cannot be justified as a reasonable place restriction primarily because it has an insufficient nexus with any public interests that may be thought to undergird § 13k." *Id.* at 181, 103 S.Ct. 1702 (footnote omitted). Though the Court did not question the importance of the purported governmental interests in maintaining security, order, and decorum near the Court grounds, it noted that there was no indication that the leafletter or picketer "obstructed the sidewalks or access to the Building, threatened injury to any person or property, or in any way interfered with the orderly administration of the building or other parts of the grounds." *Id.* at 182, 103 S.Ct. 1702.

The D.C. Circuit applied the same logic in striking down a resolution prohibiting anyone without a permit from engaging in "organized" free speech activity at Metro stations. *Turner,* 893 F.2d at 1392. WMATA had attempted to justify the permit requirement as "promoting safety, ensuring that WMATA property is used for transportation purposes, and providing equal access to WMATA facilities for all members of the public desiring to express their views." *Id.* at 1391. Notwithstanding the fact that "WMATA's stated interests [were] achieved more effectively with the regulation than without it," the regulation nevertheless failed the narrow tailoring test because it "also restrict[ed] many incidents of free expression that pose little

---

9. The court even went as far to say that "it is difficult to imagine a statute which could more plainly violate the principle that 'First Amendment freedoms need breathing space to survive [and] government may regulate in

the area only with narrow specificity.'" *Jeannette Rankin Brigade,* 342 F.Supp. at 585 (quoting *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)).

or no threat to WMATA's ability to provide safe and efficient transportation and an equitably available forum for public expression." *Id.* at 1392.

These cases stand for the fundamental proposition that an outright ban on expressive activity within a traditional public forum is almost by definition not narrowly tailored. The defendants make no attempt to distinguish these cases other than to argue that the area immediately around the Capitol is not a traditional public forum. However, even if the area within the no-demonstration zone did constitute a nonpublic forum, section 158 as amended would still be constitutionally suspect. In *Board of Airport Comm'rs of the City of Los Angeles v. Jews for Jesus, Inc.,* 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987), the Supreme Court addressed the constitutionality of a regulation which "create[d] a virtual 'First Amendment Free Zone'" at Los Angeles International Airport ("LAX") by banning First Amendment activities in LAX's Central Terminal Area. *Id.* at 574, 107 S.Ct. 2568.[10] Without even reaching the issue of whether LAX's Central Terminal was a public forum, the Court struck down the ban as facially overbroad because "[t]he resolution does not merely regulate expressive activity in the Central Terminal Area that might create problems such as congestion or disruption of the activities of those who use LAX" but also "prohibits even talking and reading[.]" *Id.* at 575, 107 S.Ct. 2568. As the Court explained further:

Under such a sweeping ban, virtually every individual who enters LAX may be found to violate the resolution by engaging in some 'First Amendment activit[y].' We think it is obvious that such a ban cannot be justified even if LAX were a nonpublic forum because no conceivable governmental interest would justify such an absolute prohibition of speech.

*Id.* Thus, it is not at all clear that the amended regulation's expansive scope could be justified even under the lesser scrutiny applied to nonpublic fora.

While the creation of a no-demonstration zone within 250 feet of the Capitol certainly addresses the "evils" it seeks to remedy, it "does so at too high a cost." *Turner,* 893 F.2d at 1392. The amended regulation not only outlaws parading, picketing, speechmaking, vigils, and sit-ins, but also literally forbids anyone from expressing a point of view about anything within the 250 feet of the Capitol, regardless of the expression's impact on traffic flow, safety, or security at the Capitol. For instance, assuming that the ban was applied literally and even-handedly,[11] a group of congressional staffers or members of the general public who stood outside the Capitol arguing about the latest campaign finance bill, health care initiative, or welfare reform would presumably be risking citation or arrest for engaging in "expressive conduct that conveys a message supporting or opposing a point of view." This risk would be present regardless of whether they created an obstruction or a disturbance. However, "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right of freedom

10. The regulation stated that LAX "is not open for First Amendment activities by any individual and/or entity," and that "any individual and/or entity [who] seeks to engage in First Amendment activities within the Central Terminal Area ... shall be deemed to be acting in contravention of the stated policy of the Board of Airport Commissioners." *Jews for Jesus,* 482 U.S. at 574, 107 S.Ct. 2568 (quoting Board of Airport Commissioners Res. No. 13787).

11. The danger, of course, is that such a broadly-worded ban would not be applied evenly, but would be selectively employed to silence those who expressed unpopular ideas regardless of whether the speaker created an obstruction or some other disturbance. *See Kroll,* 590 F.Supp. at 1286 (involving the arrest of a demonstrator at the Capitol who held up sign that "conflicted with the purpose of the ceremony" to welcome the 1980 Winter Olympic Torch Relay Team because the sign criticized the planned conversion of Olympic housing facilities into a federal prison).

of expression." *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 508, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

The government's only response is that the Capitol Police would exercise measured discretion in their enforcement of the zone. While there is authority for the proposition that the government is "entitled to the benefit of assuming that it will exercise some 'common sense' in its enforcement[,]" *Juluke*, 811 F.2d at 1560, that argument was either implicitly or explicitly rejected in all of the cases cited above in which facially overbroad regulations were struck down. *See, e.g., Turner*, 893 F.2d at 1391 (invalidating permit requirement despite WMATA's "vehement" contention that a permit "may be denied only for safety-related reasons."). The amended regulation's far-reaching prohibition on expression at the nation's preeminent public forum is antithetical to the narrow tailoring demanded by the First Amendment. It therefore cannot stand.

It is also worth noting, as Commissioner Byrd did, *see District of Columbia v. Lederman*, slip. op. at 29, that the governmental interests served by section 158 as amended are addressed by other laws that currently regulate activities on the Capitol Grounds. For instance, both section 9–112(b)(5) of the D.C.Code and 40 U.S.C. § 193f(b)(5) make it a crime "willfully and knowingly ... to obstruct or impede passage within the United States Capitol Grounds or within any of the Capitol Buildings." Likewise, both section 9–112(b)(4) of the D.C.Code and 40 U.S.C. § 193f(b)(4) make it "unlawful for any person or group of persons willfully and knowingly ... to utter loud, threatening, or abusive language, or to engage in any disorderly or disruptive conduct, at any place upon the United States Capitol Grounds or within any of the Capitol Buildings with intent to impede, disrupt or disturb the orderly conduct of any session of the Congress...." These laws possess precisely what the amended regulation lacks—a clear and substantial nexus between the restricted activity and the government's stated goals of assuring that traffic remains unobstructed and that the people and property on the Capitol Grounds remain safe and secure.

### 3. *Possible Limiting Construction*

Before striking down an enactment on its face, a court should first consider whether a limiting construction can cure its overbreadth. *See Jeannette Rankin Brigade*, 342 F.Supp. at 587. While the defendants have proffered no such construction, the plaintiff has suggested that I adopt the so-called "tourist standard" employed by the D.C. Court of Appeals in determining whether the D.C.Code provisions which regulate the Capitol Grounds are constitutional as applied in a particular case.[12] Commissioner Byrd took just such an approach when he was confronted with the plaintiff's arrest in 1997. *See District of Columbia v. Lederman*, slip. op. at 36–37.

The tourist standard, as first enunciated over 30 years ago, restricts the scope of content-neutral regulations that affect speech at the Capitol by permitting those regulations to apply only to conduct that would be "more disruptive or more substantial (in degree or number) than that normally engaged in by tourists and others routinely permitted on the Grounds." *United States v. Nicholson*, 97 Daily Wash L. Rptr. 1216 (D.C. Ct. of Gen Sess. June 19, 1969), *aff'd*, 263 A.2d 56 (1970), *reprinted as* Appendix to *Dellums v. Powell*, 566 F.2d 167, 205 n. 22 (D.C.Cir.1977), *cert. denied*, 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978). In another effort to save section 158, a court construed section

12. *See, e.g., Hasty v. United States*, 669 A.2d 127, 130–31 (D.C.1995); *Berg v. United States*, 631 A.2d 394, 398–99 (D.C.1993); *Markowitz v. United States*, 598 A.2d 398, 406 n. 7 (D.C. 1991); *Farina v. United States*, 622 A.2d 50, 59 (D.C.1993); *Reale v. United States*, 573 A.2d 13, 15 (D.C.1990) (*per curiam*); *Wheelock v. United States*, 552 A.2d 503, 508 (1988).

158's definition of "demonstration activity" as applying only to actions which "inevitably intrude upon the senses of those persons in the immediate area" because any other interpretation would raise "serious constitutional questions...." *Kroll v. United States Capitol Police*, 590 F.Supp. 1282, 1291 (D.D.C.1983), *rev'd on other grounds*, 847 F.2d 899 (D.C.Cir.1988).

Though the tourist standard (or another similar limiting construction) has some allure, facial invalidation nevertheless remains the appropriate course. The D.C. Circuit has held in the context of time, place, and manner regulations that "it is not the province of the court to 'finetune' ... regulations so as to institute the single regulatory option the court personally considers most desirable. Courts possess no particular expertise in drafting of regulatory measures; their role is to uphold regulations which are constitutional and strike down those which are not." *White House Vigil*, 746 F.2d. at 1529. In *Jeannette Rankin Brigade*, the court employed similar logic in declining to "rewrite a curiously inept and ill-conceived Congressional enactment, [which] is a function more appropriately to be performed by Congress itself." *Jeannette Rankin Brigade*, 342 F.Supp. at 587.

Though the Police Board, and not Congress, promulgated section 158 as amended, I nevertheless shall leave the rulemaking to those who are in a better position to collect information, formulate policy objectives, and draft a new regulation if necessary. Moreover, there is little danger that crowd-control efforts at the Capitol would be unduly hampered in the interim. The

provisions of section 9–112 of the D.C.Code and 40 U.S.C. §§ 193b–193f are still in place to preserve peace and order. Nor is the plaintiff left exposed to unfair risks of improper conviction. As he notes, all violations of the Capitol Grounds Regulations must be prosecuted in the D.C. Superior Court, *see* 40 U.S.C. § 212b(a), in which the tourist standard is binding. *See, e.g., Hasty v. United States*, 669 A.2d 127, 130–31 (D.C.1995).

## III. *CONCLUSION*

Though the plaintiff failed to meet his burden of establishing that the Police Board lacked the statutory authority to enact the no-demonstration zone, the government has likewise failed to meet its burden of establishing that the portion of section 158 as amended which bans "all expressive conduct that conveys a message supporting or opposing a point of view" within the no-demonstration zone is narrowly tailored to further significant governmental interests. Accordingly, the Court will: (1) dismiss Count II of the plaintiff's complaint; (2) grant plaintiff's motion for summary judgment with respect to Count I; (3) deny defendants' cross-motions for summary judgment on Count I; (4) declare that the portion of section 158 as amended which bans "all expressive conduct that conveys a message supporting or opposing a point of view" is unconstitutional on its face; and (5) permanently enjoin the federal defendants' enforcement of that provision.[13] An Order consistent with this Opinion is being issued this same day.

13. Though plaintiff requests that any injunction run against both sets of defendants, enjoining the D.C. defendants is unnecessary. Compliance by the federal defendants will produce no cases for the D.C. defendants to prosecute. In the unlikely event that the federal defendants violate the injunction, this Court's contempt and equitable powers could be invoked to secure compliance.