**COMMUNITY FOR CREATIVE NON–VIOLENCE, et al.,**
**Appellants,**

v.

**Frank A. KERRIGAN, et al.**

No. 87–5236.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 11, 1988.
Decided Jan. 17, 1989.

John A. Ragosta, with whom Myles V. Lynk and Gerald M. Rosberg were on the brief, for appellants.

Michael L. Martinez, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., were on the brief, for

appellees. Michael J. Ryan, Asst. U.S. Atty., also entered an appearance for appellees.

Before EDWARDS and WILLIAMS, Circuit Judges, and REYNOLDS,* Senior District Judge.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

The dispute in this case arose when the appellants, Community for Creative Non-Violence and their spokesperson, Mitch Snyder, (collectively, "CCNV"), sought to engage in a round-the-clock vigil on the United States Capitol Grounds to protest the plight of the homeless, using a 500-pound clay statue of a man, woman and child huddled over a steam grate. Following review of an application from the appellants for permission to demonstrate on the Capitol Grounds, the Capitol Police Board issued a seven-day, renewable permit, authorizing the vigil and use of the statue. However, pursuant to section 156(a)(2) of the Traffic and Motor Vehicle Regulations for the United States Capitol Grounds ("Capitol Grounds Regulations"), the permit stated that "[a]ll approved Props and Equipment shall not remain within the Capitol Grounds for more than 24 consecutive hours each day." Joint Appendix ("J.A.") 6.

CCNV argued that the 24-hour restriction would effectively prevent use of the statue, because it could not be disassembled and then reassembled on a daily basis. When the Board refused to alter the terms of the permit, CCNV filed suit in district court seeking a permanent injunction against the application of section 156(a)(2). The District Court denied CCNV's request and this appeal ensued. Because we find that the regulation was validly enacted and is a reasonable time, place or manner restriction, we affirm.

---

pursuant to 28 U.S.C. § 294(d).

## I. BACKGROUND

Under 40 U.S.C. § 212b (1982), the Capitol Police Board and its current Chief, Frank A. Kerrigan,[1] (collectively, "the Board"), have authority to make and enforce all rules and regulations governing the movement of vehicular and other traffic within the area constituting the U.S. Capitol Grounds. In 1976, the Board adopted regulations requiring permits for demonstrations on the Capitol Grounds and setting out rules governing the issuance of those permits. *See* Capitol Grounds Regulations §§ 153–159. One of the provisions governing the issuance of demonstration permits, section 156(a)(2), states:

No permit shall be issued for a period of more than 7 consecutive days, and no permit shall authorize demonstration activity having a duration of more than 24 consecutive hours....

On November 19, 1986, the appellants applied to the Board for a permit to serve Thanksgiving dinner on the Capitol Grounds to homeless people in the area, to hold a round-the-clock vigil, and to set up a "modern day creche" on the Grounds, consisting of a statue of a man, woman and child huddled over a steam grate. The statue is entitled "Third World America" and bears the caption: "AND STILL THERE IS NO ROOM AT THE INN."[2] CCNV planned to continue the vigil with the statue, and to serve dinner nightly to the homeless, until Congress passed emergency legislation to provide funding for the homeless or until the winter ended on March 21, 1987, whichever came first.

After the parties discussed the proposed activities, the Board granted the appellants a seven-day, renewable permit to hold the vigil, to use the statue in conjunction with the vigil, and to serve dinner on Thanksgiv-ing Day, November 27. The Board selected the location for the vigil and the placement of the statue. The permit was granted for the period from November 27 through December 3, but stated that "[a]ll approved Props and Equipment shall not remain within Capitol Grounds for more than 24 consecutive hours each day." J.A. 6. This restriction was included in order to comply with section 156(a)(2). The Board agreed that the restriction could be satisfied simply by taking a few minutes once every twenty-four hours to move the props to the sidewalk and back. Nonetheless, the requirement effectively prohibited CCNV from using the statue in the vigil, because the statue weighs approximately 500 pounds, is very fragile, and is quite difficult to move, requiring over two hours to dismantle and reassemble.

The appellants filed suit on November 26, 1986, seeking injunctive relief preventing application of section 156(a)(2) to their demonstration. Two days later, following a hearing, District Court Judge Penn, sitting as motions judge, issued a temporary restraining order prohibiting the Board from applying the 24–hour rule to the statue. *CCNV v. Carvino*, 648 F.Supp. 476 (D.D.C.1986). The appellants subsequently amended their complaint to allege that, in addition to violating the First Amendment, the regulation was not validly promulgated.

On December 17, 1986, following additional hearings on the parties' cross-motions for summary judgment, District Court Judge Oberdorfer denied the appellants' motion for a preliminary injunction. *CCNV v. Carvino*, 654 F.Supp. 827 (D.D.C. 1987). The statue was eventually removed from the Capitol Grounds in mid-January 1987.[3] Up to this time, the appellants con-

---

**1.** Kerrigan was substituted as a defendant for James J. Carvino, who was Chief at the time of the incidents in this case.

**2.** The statue has been the subject of other litigation, including a copyright suit between CCNV and the sculptor. *CCNV v. Reid*, 846 F.2d 1485 (D.C.Cir.1988), *cert. granted,* — U.S. —, 109 S.Ct. 362, 102 L.Ed.2d 352 (1988).

**3.** Although the statue has been removed from the Capitol Grounds and CCNV is not currently

conducting a vigil, we agree with the District Court that the controversy remains live and ripe for review. *See* 660 F.Supp. at 747. Consistent with our judgment in *Juluke v. Hodel,* 811 F.2d 1553 (D.C.Cir.1987), we find that this case is not moot because the appellants seek declaratory and injunctive relief and "no one doubts that the members of CCNV are likely to continue with demonstrations at the [Capitol] and therefore fear future prosecution." *Id.* at 1559 n. 22.

tinued to apply for and receive seven-day renewals of their permit.

On May 11, 1987, the District Court granted the appellees' motion for summary judgment, finding that the regulation was validly promulgated and was a reasonable time, place or manner restriction. *CCNV v. Carvino*, 660 F.Supp. 744 (D.D.C.1987). CCNV appealed.

## II. ANALYSIS

### A. *Statutory Authority*

The appellants first contend that section 156(a)(2) is *ultra vires* because it regulates matters outside of the Board's statutory authority. In promulgating section 156(a)(2), the Board relied on its authority to regulate traffic under 40 U.S.C. § 212b (1982). That statute provides:

> The Capitol Police Board ... shall have exclusive charge and control of the regulation and movement of all vehicular and other traffic ... within the United States Capitol Grounds; and said Board is authorized and empowered to make and enforce all necessary regulations therefor. ...

The appellants argue that section 156(a)(2) is not authorized by section 212b because the regulation does not address any traffic-related interests.[4]

■■■ To be valid, a regulation must be " 'reasonably related to the purposes of the enabling legislation.' " *Mourning v. Family Publications Serv., Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973) (quoting *Thorpe v. Housing Auth.*, 393 U.S. 268, 280–81, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969)). The Board concedes that its statutory authority under 40 U.S.C. § 212b is limited to the regulation of traffic. Thus, regardless of the legitimacy of the interests served by section 156(a)(2), the regulation is not within the Board's authority unless it is reasonably related to traffic-related interests.

There are no sources contemporary to the enactment of the regulation to aid us in discerning the purposes of the regulation. However, in an affidavit submitted to and relied on by the District Court,[5] George M. White, the current Architect of the Capitol and a member of the Capitol Police Board in 1976 when section 156(a)(2) was promulgated, stated that the Board had five principal goals in mind in adopting the regulation: (1) to guard against the appearance of congressional sponsorship; (2) to avoid the addition of permanent structures on the Capitol Grounds; (3) to promote the free flow of traffic; (4) to keep the forum open to others; and (5) to aid the Capitol Police in keeping day-to-day control over the Capitol Grounds. Affidavit of George M. White at 2–4, *CCNV v. Carvino*, No. 86–3271 (D.D.C. filed Dec. 10, 1986) ("Affidavit"); *see* 660 F.Supp. at 748. The appellants claim that the first two of these interests are unrelated to traffic and that the remaining three, while traffic-related, are not served by section 156(a)(2).

We agree with the appellants that the Board's interest in guarding against the

---

**4.** The appellants also argue that section 212b does not authorize the Board to regulate demonstration activity because, at the time of the statute's enactment, a separate provision in the statute—since held unconstitutional, *see Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F.Supp. 575 (D.D.C.), *aff'd mem.*, 409 U.S. 972, 93 S.Ct. 311, 34 L.Ed.2d 236 (1972)—banned demonstrations on the Capitol Grounds altogether. Thus, they contend, Congress could not have intended section 212b to give the Board the authority to regulate demonstrations. The appellants do not dispute, however, that demonstration activity is a form of traffic, *see CCNV v. Carvino*, 660 F.Supp. at 749, or that section 212b gives the Board broad authority to regulate traffic. Moreover, there is nothing in the statute or the legislative history to indicate that Congress intended to prevent the Board from addressing

the traffic-related problems posed by demonstrations simply because those problems did not exist at the time of the statute's enactment.

**5.** A court may rely on such litigation affidavits in discerning the purposes of a regulation when there is no record of the agency's rationale and "the only way there can be effective judicial review is by examining the decisionmakers themselves." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971); *accord County of Bergen v. Dole*, 620 F.Supp. 1009, 1016 (D.N.J.1985), *aff'd mem.*, 800 F.2d 1130 (3d Cir.1986). While the explanations in such affidavits "must be viewed critically," *Overton Park*, 401 U.S. at 420, 91 S.Ct. at 825, neither party in the present case has challenged the use of White's affidavit.

appearance of congressional sponsorship is completely unrelated to the Board's authority to regulate traffic. Similarly, the Board's second goal, avoiding permanent structures on the Capitol Grounds, is by the Board's own admission "essentially an aesthetic and planning interest." Brief for Appellees at 24.[6] Although prevention of permanent structures could conceivably have traffic-related justifications, any such justifications overlap with the three remaining interests advanced by the Board— promoting the free flow of traffic, keeping the forum open for others, and preserving day-to-day control over the Capitol Grounds. Accordingly, we need not consider separately whether the interest in avoiding the addition of permanent structures is rationally related to the Board's authority to regulate traffic.

These remaining three interests, however, are clearly legitimate traffic-related interests within the scope of the Board's authority under section 212b. CCNV does not argue otherwise; rather, it contends that these interests are not served by the 24-hour rule.

Like the appellants, we have some question whether the 24-hour rule promotes the free flow of traffic. The rule does not preclude the use of demonstration props or equipment and, as Judge Penn noted, "it was the [appellees] who selected the location for placement of the sculpture, and presumably, they did so having in mind the free flow of traffic." 648 F.Supp. at 478–79. In fact, as the appellants point out, the rule may actually create unnecessary traffic, by forcing demonstrators to move their props and equipment to the sidewalk and back once every twenty-four hours.

Similarly, we question whether the rule helps keep the forum available for other demonstrators. The Board agrees that the statue may be brought back to the grounds immediately after being moved, and that the appellants are entitled—indeed, required—to replace the statue in the location specified in the permit. See 648 F.Supp. at 478. Therefore, at least during the duration of the seven-day permit, the space assigned to CCNV for the placement of the statue is unavailable to other demonstrators. The enforcement of the 24–hour rule does nothing to alter this, except to require CCNV to disassemble and then reassemble the statue so that it may be immediately returned to the spot from which it was temporarily removed.

◼ In short, we seriously doubt that the 24–hour rule serves the Board's goals of promoting the free flow of traffic and keeping the forum open for others. Nonetheless, we need not decide whether these asserted interests are sufficient to sustain the rule, because we find that the rule *is* reasonably related to the Board's fifth asserted interest—*i.e.*, in maintaining day-to-day control over the Capitol Grounds. The appellants argue that requiring them to move their statue on and off the Capitol Grounds once a day in no way enhances the ability of the Capitol Police to control the Capitol Grounds. Yet, the appellants view the regulation too narrowly. The 24–hour rule does not simply require a "one-minute shuffle"; rather, it provides a useful bright-line test that supplements the separate requirement that any demonstration materials be movable. *See* Capitol Grounds Regulations § 156(c).

---

**6.** White explained that the Board's interest in avoiding permanent structures stemmed from its awareness of two statutes that govern the Capitol Grounds. The first, 40 U.S.C. § 162 (1982), sets out the duties of the Architect of the Capitol and states:

> [N]o change in the architectural features of the Capitol Building or in the landscape features of the Capitol Grounds shall be made except on plans to be approved by Congress.

The second, 40 U.S.C. § 68 (1982), provides:

> [T]here shall not be erected on any reservation, park, or public grounds, of the United

States within the District of Columbia, any building or structure without express authority of Congress.

The appellees have conceded, however, that sections 68 and 162 do not provide authority for the Board to promulgate regulations. Consequently, the desire to avoid permanent changes to the Capitol Grounds cannot justify section 156(a)(2) unless this interest is reasonably related to the interest in regulating traffic under section 212b.

The appellants themselves concede that movability is a legitimate traffic-related concern within the Board's regulatory authority. *See* Brief for Plaintiffs–Appellants at 20–22 & n. 8. There is also no doubt that the 24–hour rule ensures a real measure of movability: the regulation, by requiring all props to be *actually moved* once every twenty-four hours, relieves the Capitol Police of the need to engage in fine distinctions or assessments of whether a prop is in fact readily movable. White in his affidavit clearly stated that one of the Board's primary interests in designing the regulation was

> to develop a system which could be applied fairly to all, with as little control as possible and which removes, to the maximum possible extent, the element of discretion on the part of the Board.... This regulation does not involve itself in the question of which props may remain, but rather promotes the goal of content neutrality by providing that all props must be removed within the prescribed period.

Affidavit at 2. Moreover, despite the fact that the appellants' statue is clearly movable, the very inability to move it without considerable effort indicates that it may be a structure that the Board has a legitimate traffic-related interest in banning.

An agency regulation must pass a stricter test than the minimum rationality required of congressional statutes. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 n. 9, 103 S.Ct. 2856, 2866 n. 9, 77 L.Ed.2d 443 (1983); *Bowen v. American Hosp. Ass'n*, 476 U.S. 610, 626–27, 106 S.Ct. 2101, 2112–13, 90 L.Ed.2d 584 (1986) (plurality opinion). We nonetheless find that section 156(a)(2) passes muster, because it serves the Board's interest in maintaining day-to-day control over the Capitol Grounds, an interest that is reasonably related to the Board's statutory authority to regulate traffic under section 212b.

### B. *First Amendment*

CCNV next argues that section 156(a)(2) violates the First Amendment, because it unduly restricts CCNV's right to engage in free expression through a demonstration in a public forum. There is no doubt that the Capitol Grounds are a public forum; therefore, it follows that "the government's ability to permissibly restrict expressive conduct [on the Grounds] is very limited...." *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983). In a public forum, reasonable time, place or manner regulations on expressive activity are permissible only if they (1) are content-neutral, (2) are narrowly tailored to serve a significant governmental interest, and (3) leave open ample alternative channels of communications. *Clark v. CCNV*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3068, 82 L.Ed.2d 221 (1984); *Juluke v. Hodel*, 811 F.2d at 1559; *White House Vigil v. Clark*, 746 F.2d 1518, 1527 (D.C.Cir.1984). The parties do not dispute that section 156(a)(2) is content neutral and that the interests advanced by the Board are significant governmental interests. CCNV argues, however, that the regulation is not narrowly tailored to serve those interests, and that it does not leave open ample alternative channels of communication. We disagree.

We can dispose of the latter question fairly quickly. The appellants argue that the regulation does not leave open ample alternative channels for communication because CCNV is a poorly financed group that does not have the lobbying resources of big corporations. On this point, we agree with the District Court that "the particular hardship suffered by these particular plaintiffs, who chose to make a fragile 500 pound statue the focal point of their demonstration, does not establish that section 156(a)(2)'s requirements are generally oppressive." 660 F.Supp. at 752. CCNV is not prohibited from demonstrating on the Capitol Grounds, and it may even use large, attention-grabbing props in doing so, as long as it moves them once every twenty-four hours. In addition, as we found in *White House Vigil*,

> Demonstrators ... are free to engage in a rich variety of expressive activities: they may picket, march, hand out leaflets, carry signs, sing, shout, chant, perform dramatic presentations, solicit sig-

natures for petitions, and appeal to pass-ersby.

746 F.2d at 1528. The appellants have not challenged the separate rule that all demonstration props must be movable, and we do not find that requiring props actually to be moved once every twenty-four hours significantly closes off alternative channels of communication to the appellants.

The final prong of the time, place or manner test—the requirement that the regulation be narrowly tailored to serve substantial governmental interests—clearly poses the most difficult issue in this case. In addressing this issue, however, we do not write on a clean slate. In several previous cases, the Supreme Court and this court have applied the "narrowly tailored" test in contexts very similar to the present one—in some cases, involving the very same appellants. Accordingly, in our consideration of this case, we are significantly constrained by the existing case law. Indeed, as it turns out, this precedent is not only applicable, but plainly dispositive of the issue raised in the instant case.

In *United States v. Grace, supra,* the Supreme Court reviewed a regulation prohibiting the distribution of leaflets on the Supreme Court grounds, including the sidewalk. The Government advanced two principal justifications for the regulation. First, the Government claimed that the regulation promoted the Government's interest in protecting persons and property on the Supreme Court grounds and in maintaining proper order and decorum on those grounds. The Court acknowledged that this interest was legitimate. It questioned, however, "whether a total ban on carrying a flag, banner, or device on the public sidewalks substantially serves these purposes." 461 U.S. at 182, 103 S.Ct. at 1709. Second, the Government claimed that the ban was necessary to avoid the appearance that the Supreme Court was susceptible to public pressure. Again, the Court did not question the importance of this goal, but stated: "We seriously doubt that the public would draw a different inference from a lone picketer carrying a sign on the sidewalks around the building than it would from a similar picket on the sidewalks

across the street." *Id.* at 183, 103 S.Ct. at 1710. Finding that the regulation restricted speech in a traditional public forum and that the Government's justifications did not withstand constitutional scrutiny, the Court held that the regulation violated the First Amendment.

The decision in *Grace* makes it clear that the "narrowly tailored" portion of the time, place or manner test requires that there be a *real nexus* between the challenged regulation and the significant governmental interest sought to be served by the regulation. If the regulation does not meaningfully advance the interest, the regulation cannot withstand constitutional scrutiny if it restricts free expression in a public forum. It is not enough that a regulation is facially reasonable, or that a governmental interest is significant; rather, it must be shown that a reasonable regulation is narrowly tailored *to substantially serve* a significant governmental interest.

The foregoing points were amplified in *Regan v. Time, Inc.,* 468 U.S. 641, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984), in which the Supreme Court reviewed a federal statute limiting the printing or publishing of illustrations of U.S. Currency. The Court struck down the provision permitting illustrations only for educational, historical or newsworthy purposes, finding that this provision was not content neutral. *See id.* at 648–49, 104 S.Ct. at 3266–67 (plurality opinion). The statute's limitations on the size and color of permissible illustrations, however, were upheld as reasonable time, place or manner regulations. Addressing the "narrowly tailored" prong of the time, place or manner test, the plurality found that the limitations made it more difficult for counterfeiters to gain access to negatives that could be used for counterfeiting purposes, or to have an alibi explaining their possession of such negatives. *See id.* at 656–57, 104 S.Ct. at 3271. While the plurality acknowledged that the limitations might apply to some photographs that were not useful to counterfeiters, it concluded that the statute passed constitutional scrutiny because the restrictions substantially served the Government's compelling inter-

est in preventing counterfeiting. *See id.* at 657, 104 S.Ct. at 3271.

In a case with facts more similar to the instant appeal, the Supreme Court in *Clark v. CCNV, supra,* reviewed a challenge arising out of CCNV's application to the National Park Service for a permit to conduct a wintertime demonstration in the Capitol area in order to raise awareness about the plight of the homeless. The Park Service granted the permit and authorized CCNV to erect two symbolic tent cities, with a total of sixty tents, in Lafayette Park and the Mall.[7] However, pursuant to a Park Service regulation that prohibited camping in the parks in question, the Service denied CCNV's request that demonstrators be allowed to sleep in the tents. CCNV argued that the regulation was invalid because it interfered with the group's First Amendment rights.

The Supreme Court emphasized that a regulation may be a reasonable time, place or manner regulation even if it has "the purpose and direct effect of limiting expression." 468 U.S. at 294, 104 S.Ct. at 3069. The Court then focused on the question whether the regulation was narrowly tailored to serve the Government's significant interest in maintaining the National Parks in an attractive and intact condition. The Court rejected the argument that the regulation was invalid because it provided only incremental benefit or because there were less restrictive means of achieving the same ends. The Court admonished:

> [T]hese suggestions represent no more than a disagreement with the Park Service over how much protection the core parks require or how an acceptable level of preservation is to be attained. We do not believe, however, that either *United States v. O'Brien* [, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968),] or the time, place, or manner decisions assign to the judiciary the authority to replace the Park Service as the manager of the Nation's parks or endow the judiciary with the competence to judge how much pro-

tection of park lands is wise and how that level of conservation is to be attained.

*Id.* 468 U.S. at 299, 104 S.Ct. at 3072. Finding that the sleeping ban eased the pressure on the parks and thus served the Park Service's asserted interest, the Court upheld the regulation.

Similarly, in *White House Vigil v. Clark, supra,* this court reviewed a challenge to Park Service regulations that limited a demonstration that the appellees wished to conduct outside the White House. The challenged regulations governed the size, construction, and placement of signs on the White House sidewalk, restricted demonstrations within the center zone of the sidewalk, and prohibited the placing of parcels, except momentarily, on the sidewalk. As in *Clark v. CCNV* and the present case, there was no question that the regulations were content neutral or that the two interests asserted by the Government—preventing terrorists from using signs, packages, or other props to conceal weapons and preserving a relatively unobstructed view of the White House for tourists and passersby —were significant ones. The court also concluded that the regulation left open ample alternative channels of communication. The court's opinion concentrated on the "narrowly tailored" prong of the time, place or manner test.

The court examined each type of restriction separately. Noting that the sign limitations were part of a larger effort to protect the White House and its occupants, the court reviewed the details of the restrictions and concluded that they were "narrowly tailored to avert specific forms of terrorism." 746 F.2d at 1533. Similarly, the restrictions on demonstrations in the center zone of the sidewalk, the court found, were a narrow tool that imposed a minor burden on speech, served the public interest in having a relatively unobstructed view of the White House, and, like the sign restrictions, were part of a broader effort to allow the public to enjoy the beauty of

---

7. These areas are National Parks and are subject to a different set of regulations than are the Capitol Grounds.

the White House. *See id.* at 1536–38. Finally, the court concluded that the restriction on parcels "address[ed] a security problem of the greatest magnitude" and that the Government had reasonably concluded that "[b]ecause any such parcel *could* contain an explosive devise, all unattended parcels must be regarded as potentially suspect." *Id.* at 1541 (emphasis in original). The court acknowledged that the Government might have been able to take other measures to promote the asserted interests. However, the court warned, "it is not the province of the court to 'finetune' the regulations so as to institute the single regulatory option the court personally considers most desirable." *Id.* at 1529. Because the challenged regulations were narrowly tailored to serve substantial governmental interests, they were "within the zone of constitutionality prescribed by the first amendment." *Id.* at 1541.

Finally, in the more recent case of *Juluke v. Hodel, supra,* this court had occasion once again to apply the time, place or manner test in a context directly applicable to CCNV's current appeal. In *Juluke,* members of CCNV wished to sit on chairs just outside of the White House gate until the President spoke with the demonstrators and addressed their grievances. The protesters were prevented from doing so, however, by the same parcels regulation upheld in *White House Vigil.* As in that case, the court refused to fine-tune the regulation. The court limited its inquiry to the constitutionality of the regulation as written, finding that it was "narrowly tailored to achieve the legitimate objectives of security, traffic flow and aesthetics." 811 F.2d at 1560.

■ From this brief survey, we can derive several principles that guide our analysis of the time, place or manner test and of the "narrowly tailored" prong of that test. First, a regulation may be a lawful time, place or manner regulation even if it has the effect of limiting expression. If a regulation is a *reasonable* time, place or manner restriction, it will survive constitutional scrutiny so long as it leaves open ample alternative channels of communication, it is content-neutral, and it is narrowly tailored to substantially promote the governmental interest sought to be served.

■ Second, a regulation cannot withstand a First Amendment challenge simply on the basis of the Government's assertion that the regulation serves an admittedly legitimate interest. Nor will a court uphold a regulation that contributes marginally to that interest. Rather, the court must closely scrutinize the regulation to determine if it indeed promotes the Government's purposes in more than a speculative way. *See, e.g., Grace,* 461 U.S. at 182, 103 S.Ct. at 1709.

Third, the appropriate Government agencies, who have the authority to regulate the area in question, must be afforded a reasonable measure of discretion in determining how best to promote significant governmental interests. *Clark v. CCNV,* 468 U.S. at 299, 104 S.Ct. at 3072.

■ Finally, once the Government has chosen a regulation that withstands our close scrutiny under the First Amendment, that regulation must be upheld, and this court will not tinker with the regulation to make it less burdensome on particular parties. This does not mean that the Constitution tolerates regulations that, while serving their purported aims, prohibit a wide range of activities that do not interfere with the Government's objectives. Indeed, "the court must look to see if the burden on speech is approaching an unreasonable level, or [if] a serious loss to speech is being imposed for a disproportionately small governmental gain." *White House Vigil,* 746 F.2d at 1544 (Wald, C.J., concurring in the judgment in part and dissenting in part). The fact that a substantially less restrictive regulation will be equally effective in promoting the same ends may be relevant to the question whether the regulation is narrowly tailored. However, the court will uphold a regulation that is but a small piece of a larger effort to promote a particular interest, as long as the regulation does in fact contribute to that interest in a meaningful way. If the regulation is not fatally overbroad or otherwise unconstitutional, it is our duty to uphold it as

enacted, despite our personal preference for other regulatory measures.

Applying these principles to the instant case, we conclude that section 156(a)(2) is narrowly tailored to serve a substantial governmental interest. We do have some doubts whether the 24–hour rule is narrowly tailored to meet four of the five interests advanced by the Board: guarding against the appearance of congressional sponsorship, avoiding the addition of permanent structures, promoting the free flow of traffic, or keeping the forum open for others. We need not decide, however, whether these asserted interests withstand First Amendment scrutiny, because we find that the rule *is* narrowly tailored to meet the fifth interest: maintaining day-to-day control over use of the Capitol Grounds.

As discussed above, the regulation should not be viewed as simply a requirement for a one-minute shuffle, but rather as a bright-line test for determining whether a demonstration prop can be moved readily. In order to carry out its responsibilities in protecting the Capitol Grounds, the Capitol Police Board must have not only the authority but also the practical ability to require demonstration activities to move " 'on a daily basis as daily situations change on the Capitol grounds.' " *CCNV v. Carvino*, 660 F.Supp. at 751 n. 4 (quoting the Government's Motion for Summary Judgment). The 24–hour rule clearly enhances this ability. If demonstrators find it problematic to comply with the 24–hour rule, their props might pose an impediment to the Board's effective control over the Capitol Grounds. Moreover, by establishing a clear rule to apply in determining whether a prop is movable, section 156(a)(2) avoids the need for the Board to make more subjective judgments that could potentially pose a greater threat to First Amendment freedoms.

Seen in this light, we hold that the 24–hour rule is narrowly tailored to meet the significant governmental interest in maintaining control over the Capitol Grounds. Other regulations exist that also promote this interest, but this fact does not detract from our conclusion that the 24–hour rule materially advances the Board's control over the Capitol Grounds. Similarly, while a rule could possibly be crafted that would serve the Board's interests more precisely, we find that, with one possible exception,[8] the regulation is not impermissibly over- or underbroad, and we have no authority to fine-tune the regulation to accommodate these particular demonstrators.[9]

### III. Conclusion

Section 156(a)(2) is reasonably related to the Board's statutory authority to regulate traffic under section 212b, because it serves the Board's traffic-related interest in maintaining day-to-day control over the Capitol Grounds. The regulation is also a valid time, place or manner regulation, because it is content neutral, is narrowly tailored to serve a legitimate governmental interest, and leaves open ample alternative means of communication. The judgment of the District Court is therefore affirmed.

AFFIRMED.

---

8. At oral argument, counsel for CCNV raised a question whether the regulation was invalid as applied to the demonstrators themselves, as opposed to the statue. The rule may be overbroad in this respect, because it is not self-evident that the Board's asserted interests are served by requiring *people* to move once every twenty-four hours. This was not the issue before the District Court, however, and it was not the basis for the relief sought by the appellants. Therefore, this court need not decide whether the regulation is overbroad in this one respect.

9. We reject, as we have in the past, the appellants' argument that Supreme Court precedent requires this court to hold the regulation invalid unless we find that it is the least restrictive means to advance the Government's interests. *See White House Vigil*, 746 F.2d at 1531 & n. 97; *Juluke*, 811 F.2d at 1560; *see also Regan v. Time*, 468 U.S. at 657, 104 S.Ct. at 3271 (plurality opinion).