**Robert LEDERMAN, Appellant,**

v.

**UNITED STATES of America, et al., Appellees.**

**Nos. 01–5157 & 01–5158.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 8, 2002.

Decided May 31, 2002.

Neal Goldfarb argued the cause for appellant/cross-appellee. With him on the briefs was Arthur B. Spitzer.

Marina Utgoff Braswell, Assistant U.S. Attorney, argued the cause for appellees/cross-appellants. With her on the briefs were Roscoe C. Howard, Jr., U.S. Attorney, and R. Craig Lawrence, Assistant U.S. Attorney.

Before: EDWARDS and TATEL, Circuit Judges, and SILBERMAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge TATEL.

Concurring opinion filed by Senior Circuit Judge SILBERMAN.

TATEL, Circuit Judge:

In this interlocutory appeal, we consider a facial First Amendment challenge to a regulation banning leafleting and other "demonstration activit[ies]" on the sidewalk at the foot of the House and Senate steps on the East Front of the United States Capitol. Finding that the sidewalk is a public forum and that no part of the ban is narrowly tailored to further a significant governmental purpose, we declare the ban unconstitutional. Because the Capitol Police violated no clearly established legal rules in arresting Appellant for leafleting in violation of the ban, however, we conclude that the officers named in Appellant's *Bivens* claim are entitled to qualified immunity.

I.

The United States Capitol Grounds extend from Union Station in the North to Virginia Avenue in the South, and from Second Street Northeast to Third Streets North- and Southwest, encompassing the Capitol itself as well as House and Senate office buildings, a power plant, press areas, and public open space. *See* TRAFFIC AND MOTOR VEHICLE REGULATIONS FOR THE UNITED STATES CAPITOL GROUNDS ("CAPITOL GROUNDS REGULATIONS") DEMONSTRATION AREAS MAP. This case involves only the smaller, approximately sixty-acre area of grass, trees, sidewalks, and a few paved plazas—designed by Frederick Law Olmstead in the late 1870s—that surrounds the Capitol. *See* Architect of the Capitol, History of the U.S. Capitol Grounds, *at* http://www.aoc.gov/cc/grounds/g_history.htm (last visited Apr. 22, 2002). Although barricades prevent vehicles from entering this central area except through designated gatehouses, no barriers impede pedestrian access. As a result, members of the public use the area extensively, commuting to work, sightseeing, posing for pictures, jogging, and walking dogs.

Federal law charges the Capitol Police Board, consisting of the Sergeant at Arms of the United States Senate, the Sergeant at Arms of the House of Representatives, and the Architect of the Capitol, with regulating "movement of all vehicular and other traffic ... within the ... Capitol Grounds." 40 U.S.C. § 212b(a). Acting on this authority, the Board promulgated a regulation that restricts "demonstration activity" near the Capitol, delimiting areas in which such activity is entirely barred ("no-demonstration zones"), and areas in which demonstrations are allowed, subject to various permitting requirements ("demonstration permit zones"). CAPITOL GROUNDS REGULATIONS art. XIX, § 158, amend. II, & DEMONSTRATION AREAS MAP. "[D]emonstration activity" means:

[P]arading, picketing, leafleting, holding vigils, sit-ins, or other expressive conduct or speechmaking that conveys a message supporting or opposing a point of view and has the intent, effect or propensity to attract a crowd or onlookers, but does not include merely wearing Tee shirts, buttons, or other similar articles of apparel that convey a message.

*Id.* § 158(a), amend. II. This definition incorporates several minor revisions made during the course of this litigation. Because these revisions do not affect our analysis, however, we refer only to the current version throughout the remainder of this opinion.

In early 1997, the Capitol Police applied the demonstration ban to a lone visitor to the Capitol Grounds, appellant Robert Lederman, who was distributing leaflets in a "no-demonstration zone": the sidewalk

at the foot of the Senate steps on the Capitol's East Front. An artist participating in the annual Arts Advocacy Day, Lederman sought to publicize a lawsuit he and others had brought regarding artists' rights to sell their work on public sidewalks in New York City. In addition to his leaflets, he carried a sign that read "Stop Arresting Artists." *Lederman v. United States*, 89 F.Supp.2d 29, 31 (D.D.C. 2000) ("*Lederman I*"). Capitol Police officers approached Lederman and informed him that demonstrations were not permitted on the East Front sidewalk but that he could continue to leaflet if he moved to the lawn on the far side of the paved East Front Plaza—still in the central part of the Capitol Grounds but approximately 250 feet from the Capitol. Believing that he could not reach his intended audience from the lawn, Lederman declined to move. The officers then asked him to wait in another "no-demonstration zone": the identical sidewalk area at the foot of the House steps. While Lederman waited there, he resumed leafleting, and, after repeated warnings, appellees Lieutenant Loughery and Officer McQuay arrested him.

Lederman was charged in D.C. Superior Court with violating the Capitol Police Board's demonstration ban. Finding the ban "unconstitutional on its face and as applied to [Lederman's] conduct," the Hearing Commissioner entered an unpublished judgment of acquittal. *Id.* at 31–32. Lederman then filed this suit in the United States District Court for the District of Columbia, challenging the constitutionality of the demonstration ban and seeking compensatory damages for his arrest from various parties, including the Federal Government (under the Federal Tort Claims Act, 28 U.S.C. § 2674), the District of Columbia (under 42 U.S.C. § 1983), and Lieutenant Loughery and Officer McQuay (under *Bivens v. Six Unknown Named*

*Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)). To support his standing to bring a facial challenge to the entire ban, Lederman stated that he "wishe[d] to come to Washington in the future, on subsequent Arts Advocacy Days and on other occasions, to engage in constitutionally-protected demonstration activity in the no-demonstration zone—including, but not necessarily limited to, leafleting and holding signs." First Am. Compl. ¶ 36; *see also* Lederman Decl. ¶ 17.

The parties filed cross-motions for summary judgment, and the district court issued a preliminary opinion declaring facially unconstitutional and permanently enjoining enforcement of the portion of the ban that prohibits "other expressive conduct or speechmaking that conveys a message ... and has the intent, effect or propensity to attract a crowd or onlookers." *Lederman v. United States*, 131 F.Supp.2d 46, 53–55 (D.D.C.2001) ("*Lederman II*") (internal quotation marks and citation omitted). In so ruling, the court made clear that its order pertained only to the East Front sidewalk where Lederman was arrested, not to the paved East Front Plaza nor to the remainder of the "no-demonstration zone" surrounding the Capitol. *Id.* at 50–51. The court also declined to address the constitutionality of the part of the ban that proscribes parading, picketing, leafleting, holding vigils, and sit-ins. *See id.* at 49, 53–54 (focusing analysis on ban on "other expressive conduct or speechmaking that conveys a message ... "). Turning to Lederman's *Bivens* claim against Lieutenant Loughery and Officer McQuay, the district court held that under "clearly established" First Amendment law in the District of Columbia, expressive conduct on the Capitol Grounds is protected unless it is "more disruptive or substantial than [conduct]

normally engaged in by tourists." *Id.* at 57. Although the court believed there was "a material, factual dispute as to whether [the officers] reasonably applied [this 'tourist standard'] when they arrested [Lederman]," *id.*, it nevertheless concluded that because the Government failed to prove the officers "acted reasonably or in compliance with the ... standard," they could not invoke qualified immunity as a defense to the *Bivens* claim, *id.* at 60.

■ All parties now appeal. Lederman challenges the district court's failure to extend its ruling to the similar demonstration ban in "no-demonstration zones" other than the East Front sidewalk, as well as its refusal to invalidate the entire ban. The Government defends the ban's constitutionality and challenges the district court's qualified immunity determination. Considering these issues de novo, *see, e.g.*, *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1293 (2002) (noting standard of review on summary judgment), we do not limit our analysis—as did the district court—to the portion of the ban that proscribes "expressive conduct or speechmaking that conveys a message ... and has the intent, effect or propensity to attract a crowd or onlookers." CAPITOL GROUNDS REGULATIONS art. XIX, § 158(a), amend. II. Given Lederman's arrest for leafleting and his intent to return to the Capitol Grounds to engage in other expressive activity on the East Front sidewalk, *see supra* p. 40, he has standing to challenge the entire regulation because he has established a "distinct and palpable" threat of future "direct injury"—arrest. *Meese v. Keene*, 481 U.S. 465, 472, 107 S.Ct. 1862, 1867, 95 L.Ed.2d 415 (1987) (internal quotation marks and citation omitted).

## II.

■ As the district court rightly observed, the "degree of First Amendment scrutiny accorded to governmental decisions limiting speech on public property depends on whether the property in question is a traditional public forum, a government-designated public forum, or a nonpublic forum." *Lederman I*, 89 F.Supp.2d at 35. To determine the constitutionality of the challenged demonstration ban, therefore, we must decide whether the East Front sidewalk is a public forum. Lederman urges that we also consider the public forum status of "no-demonstration zones" other than the sidewalk where he was arrested, but we decline to do so on the record before us.

In deciding how to classify the East Front sidewalk, we have little maneuvering room, as courts have long recognized that the Capitol Grounds as a whole meet the definition of a traditional public forum: They have traditionally been open to the public, and their intended use is consistent with public expression. In *Jeannette Rankin Brigade v. Chief of Capitol Police*, a three-judge panel of the United States District Court for the District of Columbia, striking down a statute that forbade " 'parad[ing], stand[ing], or mov[ing] in processions or assemblages' " around the Capitol, concluded that the Grounds are "an area to which access cannot be denied broadly or absolutely." 342 F.Supp. 575, 583–84 (D.D.C.1972) (three-judge panel) (quoting 40 U.S.C. § 193g). The Supreme Court summarily affirmed, making *Jeannette Rankin Brigade* binding precedent. 409 U.S. 972, 93 S.Ct. 311, 34 L.Ed.2d 236 (1972). Later, in *Community for Creative Non–Violence v. Kerrigan* ("*CCNV*"), we observed that "[t]here is no doubt that the Capitol Grounds are a public forum." 865 F.2d 382, 383, 387 (1989) (upholding as "a reasonable time, place or manner restriction" a regulation limiting the length of time during which demonstration "[p]rops and [e]quipment" may remain on the

Grounds). Clearly, therefore, the "Grounds (excluding such places as the Senate and House floors, committee rooms, etc.) have traditionally been open to the public," and "the primary purpose for which the Capitol was designed—legislating"—is entirely consistent "with the existence of all parades, assemblages, or processions which may take place on the grounds." *Jeannette Rankin Brigade*, 342 F.Supp. at 584. Indeed, in *Jeannette Rankin Brigade*, the district court observed that "the fundamental function of a legislature in a democratic society assumes accessibility to [public] opinion." *Id.*

Despite this controlling case law, the Government insists the sidewalk is a nonpublic forum because it is " 'some special type of enclave.' " Appellees' Br. at 20 (quoting *United States v. Grace*, 461 U.S. 171, 180, 103 S.Ct. 1702, 1708, 75 L.Ed.2d 736 (1983)). In making this argument, the Government relies on the differences between this case and *Grace*, in which the Supreme Court considered the constitutionality of a statute that prohibited " 'display [of] any flag, banner, or device designed or adapted to bring into public notice any party organization, or movement' in the United States Supreme Court building or on its grounds." 461 U.S. at 172–73, 103 S.Ct. at 1704 (alteration in original) (quoting 40 U.S.C. § 13k (1949)). The Court limited its consideration of the constitutional issues to the area where Grace and her fellow demonstrators had attempted to exercise their First Amendment speech rights—the "public sidewalks surrounding the Court building." *Id.* at 175, 103 S.Ct. at 1705. Observing that "[s]idewalks ... are among those areas of public property that traditionally have been held open to the public for expressive activities," *id.* at 179, 103 S.Ct. at 1708, the Court concluded that the sidewalks surrounding the Court building were no exception. Writ-

ing for the majority, Justice White elaborated:

> The sidewalks comprising the outer boundaries of the Court grounds are indistinguishable from any other sidewalks in Washington, D.C..... There is no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks ... that they have entered some special type of enclave.... "Congress ... may not by its own *ipse dixit* destroy the 'public forum' status of streets and parks which have historically been public forums...."

*Id.* at 180–81, 103 S.Ct. at 1708–09 (quoting *United States Postal Serv. v. Greenburgh Civic Ass'ns*, 453 U.S. 114, 133, 101 S.Ct. 2676, 2687, 69 L.Ed.2d 517 (1981) (alteration in original)). Distinguishing *Grace*, the Government contends that the East Front sidewalk "is significantly different" from the sidewalks around the Court because the former "abuts the Capitol Building, is well within the Capitol Grounds, and does not run parallel to any city street." Appellees' Br. at 19–20. Unlike in *Grace*, however, where the Supreme Court expressly declined to consider whether the Court building and the remainder of its grounds are a public forum, in this case the entire Capitol Grounds *are* a public forum. As a result, the Government cannot prevail by establishing that the East Front sidewalk "is well within" those Grounds. Rather, to convince us the sidewalk is not a public forum, the Government must establish that the sidewalk differs from the remainder of the public Grounds in ways that make it uniquely "nonpublic."

Perhaps recognizing this requirement, the Government next argues that "[i]t is entirely possible ... to have property within areas constituting a traditional public forum be considered a nonpublic fo-

rum." *Id.* at 22. As evidence that the East Front sidewalk warrants such an exemption, the Government asserts: "[t]he sidewalk ... has never been available to the public for expressive activity," *id.* at 20; Congress Members' use of the sidewalk for "quick and unimpeded access to the House and Senate floors" is "not consistent with public debate and assembly," *id.* at 22–23; and finally, the sidewalk's function as a security perimeter around the Capitol is equally incompatible with public use, *id.* at 23–24. We are unpersuaded. To begin with, the sidewalk has never been available for public expression primarily because, for almost a century, such expression was prohibited anywhere on the Capitol Grounds by the very statute declared unconstitutional in *Jeannette Rankin Brigade.* 342 F.Supp. at 587–88. If "time, place, or manner restrictions can[not] bootstrap *themselves* into validity by their mere existence, even if prolonged," *Henderson v. Lujan,* 964 F.2d 1179, 1183 (D.C.Cir.1992) (emphasis added), then unconstitutional restrictions certainly cannot, by their mere existence, bootstrap *subsequent* restrictions into validity.

The Government's arguments regarding the limited uses of the East Front sidewalk are equally unconvincing. True, we have recognized that an area's "specialized use[s] may outweigh the attributes that would otherwise mark [it] as [a] public forum[ ]," but the Government has failed to meet its "burden ... to show that the [sidewalk's] use [is] overwhelmingly specialized." *Id.* at 1182. Even assuming, as did the district court, that the sidewalk "is used primarily by people coming to and from the Capitol building," *Lederman II,* 131 F.Supp.2d at 51, we do not think that use sufficiently "specialized" to warrant distinguishing the sidewalk from the remainder of the Grounds for purposes of the public forum analysis. If people entering and leaving the Capitol can avoid running headlong into tourists, joggers, dogs, and strollers—which the Government apparently concedes, as it has not closed the sidewalk to such activities—then we assume they are also capable of circumnavigating the occasional protester. That "clusters of individual demonstrators could ... impede access to the Capitol," Appellees' Br. at 23, is immaterial: Although such concerns may provide a basis for reasonable restrictions on the duration or size of a sidewalk demonstration, they cannot justify classifying the area as a nonpublic forum. We likewise reject the proposition that demonstrators of any stripe pose a greater security risk to the Capitol building and its occupants than do pedestrians, who may come and go anonymously, travel in groups of any size, carry any number of bags and boxes, and linger as long as they please. Again, the Government could address its concern—the presence of "groups too large to surveil individually," carrying "unscreened personal containers and belongings," *id.*—through reasonable time, place, or manner restrictions that, for example, limit the size of group demonstrations or the number of individual demonstrators.

Finally, *United States v. Kokinda,* 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990), which the Government cites for the proposition that all sidewalks are not necessarily public forums, does not control this case. For one thing, although a plurality of the *Kokinda* Court upheld the constitutionality of a U.S. Postal Service regulation prohibiting individuals from "soliciting alms and contributions" on the sidewalk leading from the Bowie, Maryland Post Office to the post office parking lot, *id.* at 722–23, 110 S.Ct. at 3117, only four Justices agreed with the Government that the sidewalk in question was a nonpublic forum, *id.* at 730, 110 S.Ct. at 3121–

22. Moreover, analyzing the public forum issue for the Chief Justice and Justices White and Scalia, Justice O'Connor focused on the fact that the sidewalk "le[d] only from the parking area to the front door of the post office" and "was constructed solely to assist postal patrons to negotiate the space between the parking lot and the front door of the post office, not to facilitate the daily commerce and life of the neighborhood or city." *Id.* at 727–28, 110 S.Ct. at 3120. In contrast, the sidewalk at issue here wraps around the Capitol's East Front almost without interruption, providing pedestrian access to the entire front of the building in addition to the doors, thereby facilitating tourist access to the Capitol—a centerpiece of our democracy.

In short, although the East Front sidewalk borders no public streets, it is "continually open, often uncongested, and constitutes not only a necessary conduit in the daily affairs of [the city's] citizens, but also a place where people may enjoy the open air or the company of friends and neighbors," *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 651, 101 S.Ct. 2559, 2566, 69 L.Ed.2d 298 (1981), and a place from which tourists may view and photograph the Capitol. Under these circumstances, we agree with the district court that, like the rest of the Capitol Grounds, the sidewalk is a traditional public forum.

### III.

Because the East Front sidewalk is a public forum, "the government's ability to permissibly restrict expressive conduct [there] is very limited: [It] may enforce reasonable time, place, and manner regulations as long as the restrictions 'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" *Grace,* 461 U.S. at 177, 103 S.Ct. at 1707 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983)). Lederman principally argues that the ban (1) is not narrowly tailored to controlling traffic and promoting security around the Capitol, and (2) fails to leave open ample alternative channels of communication. Because we agree with the former, we do not address the latter.

We begin with the principles that guide our narrow tailoring analysis. First, we "closely scrutinize" challenged speech restrictions "to determine if [they] indeed promote[ ] the Government's purposes in more than a speculative way." *CCNV,* 865 F.2d at 390. Second, per se bans on expressive conduct are inherently suspect. *See Grace,* 461 U.S. at 182, 103 S.Ct. at 1709 (questioning the need for a "total ban" on carrying flags and banners). Third, while the Government "must be afforded a reasonable measure of discretion in determining how best to promote" its identified interests, the Constitution does not tolerate "regulations that, while serving their purported aims, prohibit a wide range of activities that do not interfere with the Government's objectives." *CCNV,* 865 F.2d at 390. Fourth, "[t]he fact that a substantially less restrictive regulation [would] be equally effective in promoting the same ends may be relevant" to the constitutional analysis. *Id.*

The first principle presents little difficulty in this case. We need not "speculat[e]" at all to assume that the demonstration ban discourages some people from coming to the East Front sidewalk to express themselves, thereby reducing pedestrian traffic and decreasing risks to the Capitol and its occupants. Thus, the Board could reasonably have concluded that the ban would serve those interests.

The remaining principles, however, reveal the ban's profound flaws. To begin with, it imposes precisely the sort of "total" restriction on certain types of speech that the Supreme Court "question[ed]" in *Grace.* 461 U.S. at 182, 103 S.Ct. at 1709. Even if we read the ban narrowly—assuming that the sole qualifier (that the activity in question must convey a message and have the "intent, effect or propensity" to attract more than one onlooker) modifies the entire list of proscribed activities, from "parading" to "speechmaking"—that qualifier is of no practical significance: Demonstration activity always conveys a message (that is, after all, its purpose), and it has the "propensity" to attract more than one onlooker whenever it is loud or obvious enough to be heard or noticed by more than one passerby. As the district court observed, "[i]t is hard to conceive of much expression that a reasonable officer would *not* find to be conveying a message[,] . . . [and] an officer reasonably could determine that any expressive conduct meeting th[is] first definition, with the possible exception of private conversations, has the . . . 'propensity' to attract . . . onlookers." *Lederman II,* 131 F.Supp.2d at 54. The regulation's exemption of expressive tee-shirts and buttons is equally insignificant. As in *Grace,* the problem here is that certain types of speech (parading, picketing, leafleting, vigils, sit-ins, and speechmaking) are, even under a narrow reading, almost entirely prohibited. That the ban permits other types of speech may establish that it "leave[s] open ample alternative channels of communication," *Grace,* 461 U.S. at 177, 103 S.Ct. at 1707 (internal quotation marks and citation omitted), but that fact hardly demonstrates that the ban is narrowly tailored to its objectives.

The ban's absolute nature might be less troubling if—in accordance with the third principle—all listed demonstration activities could reasonably be expected to interfere with the stated objectives of traffic control and safety. Some banned activities, however, cannot possibly pose that risk. For example, a single leafleteer standing on the East Front sidewalk will no more likely block traffic or threaten security than will photographers, star-struck tourists, and landscape painters complete with easels, but the Board has made no effort to keep any of these latter individuals away from the Capitol. "Freedom of expression . . . would rest on a soft foundation indeed if government could distinguish" between demonstrators and pedestrians on "a wholesale and categorical basis," without providing evidence that demonstrators pose a greater risk to identified government interests than do pedestrians. *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 101, 92 S.Ct. 2286, 2293, 33 L.Ed.2d 212 (1972). We likewise doubt that "a group of congressional staffers" standing "outside the Capitol arguing [loudly] about the latest . . . bill" would impede traffic flow or raise security concerns, yet "assuming that the ban was applied literally and evenhandedly," such a group "would presumably be risking citation or arrest for engaging in 'expressive conduct.'" *Lederman I,* 89 F.Supp.2d at 41.

Perhaps the most troubling aspect of the Board's virtually per se ban on expressive activity on the East Front sidewalk is the ready availability of "substantially less restrictive" alternatives that would "equally effective[ly]" promote safety and orderly traffic flow. *CCNV,* 865 F.2d at 390. For example, the Board could rely on existing laws that bar visitors to the Capitol Grounds from "utter[ing] loud, threatening, or abusive language, . . . engag[ing] in any disorderly or disruptive conduct," or "obstruct[ing] . . . or . . . imped[ing] passage through or within" the Grounds. 40 U.S.C. § 193f(b)(4)–(5). Alternatively, the

Board could require permits for demonstrations on the sidewalk, limit the duration of such demonstrations, restrict the number of individuals who may demonstrate simultaneously, require that demonstrators present bags and other personal possessions to police officers for screening, or prohibit activities likely to attract *large* crowds. We emphasize that in listing these alternatives, we do not intend to provide the Board with specific suggestions for future regulations—indeed, we are uncertain that every identified alternative would survive constitutional scrutiny, though some surely would. Rather, our list shows only that the Government could achieve its intended objectives while also permitting some demonstrations on the East Front sidewalk.

Moreover, because our hypothetical alternatives, like the existing ban, aim at future speech, we find unconvincing the Government's warning that striking down the current ban will somehow preclude the Police Board from "enact[ing] regulations to address conduct reasonably expected to occur." Appellees' Br. at 28. We well recognize that under established First Amendment doctrine, the Government may issue reasonable, prospective, time, place, and manner regulations that restrict expressive activity on the East Front sidewalk. We hold only that, as currently written, the demonstration ban imposes "a serious loss to speech ... for a disproportionately small governmental gain," *White House Vigil for the ERA Comm. v. Clark*, 746 F.2d 1518, 1544 (D.C.Cir.1984) (Wald, J., concurring in the judgment in part and dissenting in part on other grounds), thus violating the narrow tailoring requirement.

## IV.

 This brings us to the issue of Lieutenant Loughery's and Officer McQuay's qualified immunity for arresting

Lederman. "Qualified immunity shields officials from liability for damages so long as their actions were objectively reasonable, as measured in light of the legal rules that were 'clearly established' at the time of their actions." *Kalka v. Hawk*, 215 F.3d 90, 94 (D.C.Cir.2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982)). In analyzing this issue, we first determine whether "the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). "[I]f a violation could be made out on a favorable view of the parties' submissions, the next ... step is to ask whether the right was clearly established." *Id.* If existing law at the time of the violation "did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.* at 202, 121 S.Ct. at 2156–57.

 By finding the Police Board's demonstration ban unconstitutional, we have resolved the "threshold question," *id.* at 201, 121 S.Ct. at 2156: Lederman's arrest violated his constitutional rights. For three reasons, however, we do not believe that existing law at the time of the arrest "put [Lieutenant Loughery and Officer McQuay] on notice that [their] conduct would be clearly unlawful." *Id.* at 202, 121 S.Ct. at 2156. First, while *Jeannette Rankin Brigade* and *CCNV* establish that the Capitol Grounds as a whole are a public forum, neither case discusses individual areas of the Grounds, and we agree with the Government that some areas within a large public forum may be nonpublic if their "use" is "specialized." *Henderson*, 964 F.2d at 1182. Indeed, the three-judge panel in *Jeannette Rankin Brigade* suggested that its First Amendment analysis might have produced a dif-

ferent result if the expressive conduct at issue had occurred "near or in the immediate vicinity of the Capitol itself." 342 F.Supp. at 584 (internal quotation marks omitted). While we now explicitly hold that the First Amendment analysis does not, in fact, differ on the East Front sidewalk, we nevertheless think a reasonable police officer could have believed that the sidewalk's proximity to the Capitol altered the First Amendment balance with respect to demonstration activities there.

Second, we agree with the Government that because narrow tailoring is "not an exact science," a reasonable officer should not be expected to perform that analysis prior to arresting an individual for violating an ostensibly lawful time, place, and manner restriction governing expressive activity in a public forum. Appellees' Br. at 52. As the Supreme Court stated in a different context prior to *Harlow*:

> The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality—with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws. Society would be ill-served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement.

*Michigan v. DeFillippo*, 443 U.S. 31, 38, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979); *see also Grossman v. Portland*, 33 F.3d 1200, 1210 (9th Cir.1994) ("[A]n officer who reasonably relies on the legislature's determination that a statute is constitutional should be shielded from personal liability."). Although the demonstration ban is a regulation not a statute, we think a similar standard applies here. While we find the ban's sheer breadth astonishing, we recognize that the Police Board made some attempt at tailoring—it exempted expres-

sive tee-shirts and buttons and included the phrases regarding "convey[ing] a message" and "ha[ving] the intent, effect or propensity to attract a crowd or onlookers." CAPITOL GROUNDS REGULATIONS art. XIX, § 158(a). Although those qualifiers cannot begin to satisfy the narrow tailoring requirement, *see supra* pp. 44–45, we think their inclusion in the ban keeps it from being "so grossly and flagrantly unconstitutional," *DeFillippo*, 443 U.S. at 38, 99 S.Ct. at 2632, that the officers should have recognized its flaws.

Third, as the Government points out, the East Front sidewalk "has never been available to the public for expressive activity." Appellees' Br. at 20; *see also supra* pp. 42–43. Although the longstanding policy of prohibiting demonstrations around the Capitol cannot "bootstrap" the current ban "into validity," *Henderson*, 964 F.2d at 1183, we do think that policy could have misled a reasonable police officer as to the ban's constitutionality.

■ Finally, we must consider the significance of the District of Columbia Court of Appeals' "tourist standard," on which the district court relied. *See supra* p. 41. To begin with, contrary to Lederman's assertion, we have never "held" that the tourist standard "governs" the constitutionality "of arrests for demonstration activity on the Capitol Grounds." Appellant's Br. at 38. Rather, in *Dellums v. Powell*, the lone case in which we cited the standard, we were applying a District of Columbia law that District courts had "definitively construed" to incorporate the standard. 566 F.2d 167, 177 (D.C.Cir. 1977) (citing *United States v. Nicholson*, Nos. 20210–69A et al. (D.C.Ct. of Gen.Sess. June 19, 1969), *aff'd*, 263 A.2d 56 (D.C.App.1970)). Of course, that we have never incorporated the tourist standard into our First Amendment jurisprudence does not resolve the qualified immunity

issue because, in evaluating what constitutes "clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738, we must look not just to federal case law, but also to the law of the highest court in the state in which the case arose, *see Doe v. Delie,* 257 F.3d 309, 321 n. 10 (3d Cir.2001) (reviewing federal appellate decisions regarding what constitutes "clearly established" law).

Even if the tourist standard represents "clearly established" law, however, two factors convince us that the standard does not bar qualified immunity for the officers in this case. First, although the District of Columbia Court of Appeals has stated that it "impose[s] the 'tourist standard' to save content-neutral statutes regulating the time, place, and manner of expression from unconstitutionality in their application," *Berg v. United States,* 631 A.2d 394, 398 (D.C.1993), we have found no case in which the court has applied the standard to any federal law or regulation. Even assuming that the appeals court would apply the standard to the demonstration ban and other federal laws if given the opportunity, we see no basis for requiring reasonable police officers to foresee that possibility. Second, we are unpersuaded that Lederman's leafleting "clearly" met the standard. Because District of Columbia courts have never applied the standard to a case involving leafleting, we think a reasonable police officer could conclude that leafleting, which requires some minimal personal interaction between the leafleteer and his audience, is "more disruptive" to passing pedestrians, including Members of Congress and their staff, than the conduct of an average tourist.

Overall, therefore, whether we review only the officers' conduct in relying on the unconstitutional demonstration ban, or consider also their alleged violation of the District of Columbia tourist standard, we cannot conclude that their arrest of Lederman violated his "clearly established" rights. The officers are therefore entitled to qualified immunity.

V.

We declare the entire demonstration ban unconstitutional, find that Lieutenant Loughery and Officer McQuay are entitled to qualified immunity for their roles in Lederman's arrest, and remand for entry of an injunction barring enforcement of the ban and for further proceedings consistent with this opinion.

*So ordered.*

SILBERMAN, Senior Circuit Judge, concurring:

I concur in the court's opinion. We are certainly bound by *Jeannette Rankin Brigade v. Chief of Capitol Police,* 342 F.Supp. 575 (D.D.C.1972) (three judge panel), *aff'd,* 409 U.S. 972, 93 S.Ct. 311, 34 L.Ed.2d 236 (1972). However, I think it is distinctly possible that the later Supreme Court case, *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983), particularly the Court's implicit rejection of Justice Marshall's position that the whole of the Supreme Court's grounds are a traditional public forum, betokens a more sympathetic reception to the government's arguments. To be sure, *Jeannette Rankin Brigade* was summarily affirmed, but the Court rarely considers itself bound by the reasoning of its prior opinions— which is why I have referred to it as a "noncourt court," *see United States v. Moore,* 110 F.3d 99, 102 (D.C.Cir.1997) (Silberman, J., dissenting from denial of rehearing en banc)—let alone a summary affirmance. (Of course, the Court's reluctance to offend Congress would not be irrelevant.)

In light of my doubts as to how this case will be received by the Supreme Court if *certiorari* is granted, I join my colleagues' treatment of the *Bivens* claim. However, I am inclined to think that under applicable immunity law each of the police officer's conduct should be judged as if he were the lawyer for the Capitol Police.